[No. 523-2.    Division Two.    August 25, 1972.]

THE STATE OF WASHINGTON, *Respondent*, v. DON MURPHY,
*Appellant.*

*Burton W. Lyon, Jr.* and *Ronald J. Meltzer,* for appellant.

*Ronald L. Hendry, Prosecuting Attorney, Joseph D. Mladinov, Special Counsel,* and *Eugene G. Olson, Chief Criminal Deputy,* for respondent.

PETRIE, C.J.—Don Murphy, the defendant, owns and operates a demolition-construction business as well as a lumber yard at 64th and Waller Road in Pierce County. As a matter of policy, he has weapons hidden in strategic locations throughout his business area so that, in his words,

> [S]hould anyone come in there with an idea of robbing anyone, and if he stayed over 15 minutes, somewhere in that time one or more of the men would have a perfect opportunity, without being apparent, to pick up one of these guns and put an end to this situation.

Sometime in 1967 or 1968 he first became acquainted with personnel of the Puget Sound Air Pollution Control Agency. During the ensuing 2 years he encountered such personnel on several occasions, met with them to discuss allegations that he had been allegedly maintaining illegal fires on his business premises, and on several occasions made clear to them that they were not to come onto his business premises for any inspection purposes without first stopping at his office for proper clearance. On one occasion he told one of the agency personnel, Mr. Walter DeHaan, "We are not trying to exclude you from the property, but we're merely saying you come to that office first." Despite these remonstrances, "many times" he has received notices of violations through the mail, apparently unaware that an inspector had been on his premises.

On the morning of January 9, 1970, one of Mr. Murphy's employees came up to the office and said, "Murphy, there are two Air Pollution Control Officers down there and they are taking pictures and asking questions, and one of them is a great big guy." Mr. Murphy got a .38 caliber special Smith and Wesson out of a drawer, tripped it open, kicked the shells back into the drawer, stuck the gun into his belt, and went down the hill with his employee who had advised him of the presence of the two agency officers. "At that time", he testified, "I was real angry because again they came up and without notification, and notifying the office, and undoubtedly they knew I was there."

He testified that he walked into the yard bellowing and

hollering, called the two officers "some real first-class names" and told them "You guys get off this property . . . I don't want you guys coming into this yard without checking into the office, and get off of here or there is going to be trouble." Asked if he had taken the gun from his belt, he replied, "I was a little overweight, more than I am now, at that time, and the gun was hurting my stomach, so I pulled it out and dropped it at my side." He kept his finger on the trigger but did not cock the piece; he contends that he never did point the gun at either of the two agency inspectors. Asked by his counsel whether or not he had referred to the gun in any way while talking to the two men, he responded:

A  It would have been superfluous, they were well aware of the gun, that was the thing their eyes never left. I didn't have to point it out to them. They knew where it was at all times.

Q  Did you say anything about the gun?

A  I never mentioned the gun to them. I didn't have to. I wouldn't be—I just wouldn't have done that. Their eyes were right on that gun just like that.

He explained the necessity of a gun as follows:

A  I know this, if you get in an argument with somebody there ain't going to be a fight if you got a pistol even if it is empty. They don't know whether it is loaded or not, and they're not going to attack you if you have a pistol in your hand, and they're not going to argue with you.

Q  Were you afraid of being attacked?

A  I wasn't afraid of being attacked per se. What I was afraid of was when I run them off, that if I went down there without a gun they might get in an argument and we might get into a fight, and if we got into a fight they would bring up all kinds of things. I didn't want any violence; that was the reason I took the pistol, so there would be no argument, so when they left they would leave without argument and with haste. That's all I took the pistol for.

. . .

A  The purpose of taking the pistol, Mr. Fleming, was

so there wouldn't be an argument; so there wouldn't be a fight; so there wouldn't be any problems. I went down there for one reason and one reason only; to get those fellows off that property so they quit harassing and bothering my workers, that was all.

We have quoted somewhat extensively from Mr. Murphy's own testimony. Needless to say, the version of the confrontation given by the two inspectors, Mr. DeHaan and Mr. John Conner, was somewhat at variance with Mr. Murphy's version. DeHaan testified that Murphy, ranting and raving, pulled out a .38 revolver and, pointing it at DeHaan and Conner, said: "You see this? You see this? You get off my property and stay off or I'll use this on you." DeHaan and Conner reported their version of the events to the Pierce County sheriff's office. Murphy was subsequently charged with two counts of second-degree assault, each count alleging an assault against a separate victim, with a weapon likely to produce grievous bodily harm. He was convicted by jury verdict and sentenced to confinement for a maximum period of 10 years on each count, sentences to run concurrently.

Mr. Murphy's appeal raises a myriad of issues. However, in view of our disposition—that a new trial should be granted—we need only consider those issues which are likely to recur at any subsequent trial.

A new trial clearly must be granted because prejudicial error occurred during trial when a deputy sheriff, to whom Mr. Conner had reported the encounter with Mr. Murphy, was permitted, over objection, to recite the details of the report which Conner gave to the witness. The trial court recognized the testimony, which the deputy sheriff was about to relate to the jury, was hearsay evidence if presented for the truth of the matter asserted, but nevertheless overruled the objection thereto and instructed the jury, "[T]his is not admitted to say that it necessarily happened, but just what this Officer heard and what was reported to him, not as to prove the truth of something."

■ Out-of-court statements of another person, when not offered for the purpose of establishing the truth of the matter asserted, are sometimes admissible—not as an exception to the hearsay rule, but rather precisely because they are not then hearsay—if such out-of-court statements as so utilized are relevant to a material issue in the cause. *Moen v. Chestnut,* 9 Wn.2d 93, 113 P.2d 1030 (1941); *Betts v. Betts,* 3 Wn. App. 53, 473 P.2d 403 (1970). In the present instance, we know of no reason, and none has been suggested to us, why the information relayed by Conner to the deputy sheriff was relevant to any issue in the trial—except the value such information would have for the truth of the matter asserted. Its value, therefore, was clearly dependent upon the veracity and competency of some person other than the witness. *See State v. Cunningham,* 51 Wn.2d 502, 319 P.2d 847 (1958).

The state, in its brief, directs our attention to *Moore v. Mayfair Tavern, Inc.,* 75 Wn.2d 401, 451 P.2d 669 (1969), in which the court approved the practice of permitting a physician to relate to the jury the history he receives from the person he examines; this on the theory that the evidence is admissible not as evidence of the truth of the statements, but simply as evidence that the statements were made. This is but a special application of the rule referred to in *Moen v. Chestnut, supra,* which permits a physician to recite the history received for the limited purpose of establishing the basis upon which he premised his medical conclusion. *Smith v. Ernst Hardware Co.,* 61 Wn.2d 75, 377 P.2d 258 (1962). In the case at bench, however, we are not concerned with any conclusion the deputy sheriff may have reached because of the factual presentation recited to him by Mr. Conner. The re-recital of the report Conner gave to the deputy sheriff was hearsay evidence pure and simple and should not have been presented to the jury.

The prejudicial nature of the hearsay evidence becomes apparent when it is contrasted with Conner's own version of the events as a witness. The deputy sheriff, for example, testified that Conner related to him "I was so scared

that if there had been an object nearby that I could have gotten ahold of, I probably would have used it for my protection as well as Mr. DeHaan's." Conner himself did not so testify as a witness. The deputy sheriff was permitted to inject, "They couldn't reason with the man." In view of the remainder of the record, the jury might well have reached the same conclusion as to DeHaan's and Conner's ability to reason with Murphy, but that was a conclusion the jury should reach without the editorial assistance of a law enforcement officer who was not present at the scene of events.

Although the foregoing analysis is sufficient to dispose of this appeal, we deem it necessary to assert our views on two additional matters raised by the appeal which are basic to the issues and which will undoubtedly be presented in any new trial. Fundamentally, Mr. Murphy presented two defenses to the information filed against him: (1) that under the factual circumstances the amount of force he used on January 9, 1970 to eject Mr. DeHaan and Mr. Conner from his business premises was justifiable and therefore not punishable; and (2) that the display of force used, under all the circumstances, even if not justifiable, was insufficient to establish the crime with which he was charged. We shall consider these matters in inverse order.

Second-degree assault, insofar as the information in this case is concerned, is defined by RCW 9.11.020 as follows:

Every person who, under circumstances not amounting to assault in the first degree—

. . .

(4) Shall wilfully *assault* another with a weapon or other instrument or thing likely to produce bodily harm; or

. . .

Shall be guilty of assault in the second degree . . .

(Italics ours.)

Because the statutory definition of second-degree assault reuses the word "assault", resort must be had to the common law for a definition of that word as it is used

to denote action punishable under the statute. *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 125 P.2d 681 (1942). It is firmly established in this state that an assault is an attempt, with unlawful force, to inflict bodily injury upon another, accompanied with the apparent present ability to give effect to the attempt if not prevented. *State v. Shaffer*, 120 Wash. 345, 207 P. 229 (1922); *State v. Evans*, 32 Wn.2d 278, 201 P.2d 513 (1949). It has been said that within that definition, one would be guilty of assault, if he raised his hand in anger with the apparent purpose to strike and sufficiently near to enable the purpose to be carried into effect; whether or not there has been an assault in a particular case depends more upon the apprehension created in the mind of the person assaulted than in the undisclosed intention of the person assaulting. *Peasley v. Puget Sound Tug & Barge Co., supra; State v. Rush,* 14 Wn.2d 138, 127 P.2d 411 (1942). It is also firmly established in this state, under the foregoing definition of an assault, that if, within shooting distance, one menacingly points at another with a gun, apparently loaded yet not in fact, he commits an assault the same as if it were loaded; there must be some power, actual or apparent, of doing bodily harm; but apparent power is sufficient. *State v. Harris,* 69 Wn.2d 928, 421 P.2d 662 (1966); *State v. Stewart,* 73 Wn.2d 701, 440 P.2d 815 (1968).

Murphy insists, however, that he did not point the gun at either DeHaan or Conner. In this he is supported by several witnesses. More importantly, he contends that under the trial court's instruction defining second-degree assault, the jury could have believed his version of the encounter and still convict him of the crimes charged. We agree that the instruction was faulty. It told the jury:

An assault in the second degree, as herein charged, may be committed by an actual *threat to use* a weapon or instrument likely to produce bodily harm or the *display* of such weapon or instrument.

Such action, a threat or display, must be such that a reasonable person using ordinary prudence and intelligence, in light of all the circumstances existing at the

time would be afraid for his own bodily safety by the presence of such weapon or instrument.

It is no defense to such a charge that the weapon was unloaded at the time, if it would reasonably appear to the other person that the weapon may have been loaded.

(Italics ours.)

■ The fault in the instruction, totally aside from its failure to include reference to justification (see *State v. Hilsinger*, 167 Wash. 427, 9 P.2d 357 (1932)) lies in its failure to distinguish between violence menaced and violence begun. The line between violence menaced and violence actually begun is a thin one but there must be some physical effort by the actor to carry into execution the violence menaced before it can be said that an assault has been committed. *State v. McFadden*, 42 Wash. 1, 84 P. 401 (1906). The overt act, sufficient to establish an "attempt", must reach far enough toward the accomplishment of the target crime to amount to the commencement of the consummation. *State v. Gay*, 4 Wn. App. 834, 486 P.2d 341 (1971). It is difficult, in practice, to draw the precise line; yet vitally necessary, in practice, because until the execution of violence menaced has begun there can be no assault. *See* 1 R. Anderson, *Wharton's Criminal Law and Procedure* 678 (1957).

While Mr. Murphy's actions were sufficient to sustain a jury determination that he was guilty of assault in the second degree, the court's instruction failed to fairly present to the jury the intent element of the offense which inheres in the distinction between violence menaced and violence begun (*i.e.*, "attempt"). Defendant's proposed instruction 5 as set forth in the margin[1] should have been given. That instruction contains a proper statement of the law. *Peasley v. Puget Sound Tug & Barge Co., supra.* It should be accompanied by an explanatory instruction per-

[1]That instruction provides: "You are instructed that an assault is an attempt, with unlawful force, to inflict bodily injury upon another, accompanied with the apparent present ability to give effect to the attempt if not prevented."

taining to the meaning of attempt as per *State v. Mc-Fadden, supra,* and *State v. Gay, supra.*

We next turn to Mr. Murphy's primary assignments of error—that through instructions given and through refusal of the trial court to admit his evidence offered, he was effectively and systematically denied the right to present to the jury the position that the amount of force he displayed was justifiable under the circumstances. He contends that his actions were justified because the actions of DeHaan and Conner constituted malicious trespass and malicious interference with his use and enjoyment of private property—that once again they came upon his property without notifying him and once again they were harassing and bothering his employees. He finds support for these theories of defense in RCW 9.11.040, the pertinent portions of which provide:

> The use, attempt, or offer to use force upon or toward the person of another shall not be unlawful in the following cases:
>
> . . .
>
> (3) Whenever used by a party *about to be injured,* or by another lawfully aiding him, in preventing or attempting to prevent an offense against his person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his possession, in case the force is not more than shall be necessary;

(Italics ours.)

The dual ambiguities in this statute were succinctly stated by the court in *Peasley v. Puget Sound Tug & Barge Co., supra* at 507:

> This statute is somewhat ambiguous in two respects: First, while it specifies certain circumstances under which the use of force shall not be unlawful, it does not affirmatively state that the use of, or attempt or offer to use, force shall be unlawful in all other circumstances. It is only by inference that we can adopt this tentative corollary. Second, the phrase "about to be injured" may be construed as referring either to injury in the general sense or merely to injury to one's person. If the former construction be adopted, then force may be used to the

extent necessary to prevent a malicious interference with real or personal property lawfully in the possession of the person using the force; while if the second construction is the proper one, then it would seem that force may never be used in the protection of property.

■ The *Peasley* court expressly declined to resolve the ambiguities specified, preferring instead to wait for "a case where a party is directly charged with the crime of assault, and the question of his guilt expressly determined in such action." The case at bench fits this description. Nevertheless, we, too, deem it unnecessary to resolve the statutory ambiguities. Under the statute or under the common law, the use of a deadly weapon by a private party to eject a mere nonviolent, nonboisterous trespasser, who, at most can be understood to be interfering with a private party's intangible proprietorial interests, is, as a matter of law, not a justifiable use of force.

Whether or not the force used in the defense of property is greater than is justified by the existing circumstances is ordinarily a question of fact for the jury to determine under proper instructions. *Peasley v. Puget Sound Tug & Barge Co., supra.* However, the amount of force used in resisting even an unlawful arrest has its limitations. In *State v. Rousseau,* 40 Wn.2d 92, 241 P.2d 447 (1952) it was determined that the force used in resisting an unlawful arrest—an assault and battery—must be reasonable and proportioned to the injury attempted upon the party sought to be arrested, and the party resisting cannot use or offer to use a deadly weapon if he has no reason to apprehend a greater injury than a mere unlawful arrest. Most certainly, the force used in repulsing a mere civil trespass also has its limitations. Not every altercation over property comes within the intent and design of the justification statute. *State v. Blaine,* 64 Wash. 122, 116 P. 660 (1911).

In the case at bench, it is not contended that the trespass, if it was a trespass, was accompanied by such force even to constitute a breach of peace. There was no reason for Murphy to apprehend—nor does he contend that he was en-

gaged in resisting—an unlawful arrest. Much less was there any reason for him to apprehend a greater injury than an unlawful arrest.

Mr. Murphy's action in arming himself with a revolver was well calculated to excite apprehension of great bodily harm in the minds of the two persons who, he believed, were harassing his business interests. This is clearly expressed in his own explanation for the use of the weapon. There is a recklessness—a wanton disregard of humanity and social duty—in the threatened use of deadly force to repel what at most could be considered a petty inconvenience, which is essentially wicked and which the law abhors. The law forbids such a menacing of human life for so trivial a cause. *People v. Doud,* 223 Mich. 120, 193 N.W. 884, 32 A.L.R. 1535 (1923). We hold, as a matter of law, under Mr. Murphy's own contentions and offers of proof, that the use of a deadly weapon was not justified in ejecting Mr. DeHaan and Mr. Conner from his premises. The issue of justification should, therefore, never have been presented to the jury in any form.

Finally, there are several other matters which we would not expect to reappear in any retrial. However, we comment upon them only because our failure to do so might be construed as our approval of the action taken at the first trial, and to avoid any necessity that they be considered the law of the case. *Miller v. Sisters of St. Francis,* 5 Wn.2d 204, 105 P.2d 32 (1940).

■ Ordinarily, in the trial of a case in superior court, there should be no reference to proceedings had before a committing magistrate. When, as here, a proper foundation for impeachment of a witness has been laid by reference to contrary testimony of that witness before the committing magistrate, it is error to refuse competent evidence of the actual testimony of that witness before the committing magistrate. The final action taken by a committing magistrate is not material to any issue at the subsequent trial of that same matter in the superior court.

After his arrest, Murphy engaged in a telephone conver-

sation with a radio announcer. A detective, in whose presence the conversation took place, testified as to a portion of that conversation. The detective stated, in part:

[Murphy] stated he was being arrested for pollution violation and the fact he had ran a couple people off his property at gun point, and he had a right to protect his property with a gun if necessary. His attitude changed and he became laughing—still loud, but laughing, saying he scared the shit out of two people on his property. He had run them off with a gun and he felt he had a right to do so, and if he was arrested on this charge he was going to sue Pierce County and the Pollution Control Board and everyone connected with it.

The taped recording of the entire telephone conversation, which clearly negates this testimony, was admissible even though the tape in the first instance would not have been admissible.

Judgment reversed.

PEARSON and ARMSTRONG, JJ., concur.

Petition for rehearing denied October 2, 1972.

Review denied by Supreme Court November 24, 1972.