[No. 61472-5.  En Banc.  January 19, 1995.]

THE STATE OF WASHINGTON, *Petitioner*, v. JAMES MITCHELL BYRD, *Respondent*.

*Norm Maleng, Prosecuting Attorney,* and *John L. Belatti, Deputy,* for petitioner.

*Lenell Nussbaum,* for respondent.

JOHNSON, J. — Defendant James Byrd was convicted of assault in the second degree. He challenges the trial court's use of a jury instruction based on former WPIC 35.50, contending the instruction's second paragraph unconstitutionally relieved the State of its burden of proving the Defendant's intent to cause apprehension and fear of bodily harm. The Court of Appeals reversed Byrd's conviction on that basis, holding the challenged instruction denied the Defendant a fair trial. This court granted the State's petition for review and we now affirm the decision of the Court of Appeals.

## BACKGROUND

In December 1989, Paul and Jayne Byrd separated and filed for dissolution. At approximately the same time, Jayne and John "Butch" Lindemulder began to see each other frequently. Defendant James Byrd, brother of Paul Byrd, considered the relationship between Jayne and Lindemulder a betrayal of Lindemulder's friendship with Paul. James began monitoring Jayne's comings and goings.

On the afternoon of February 13, 1990, Lindemulder telephoned James Byrd "[t]o see if he was mad at me and why". RPI, at 34.[1] According to Lindemulder, Byrd wanted to meet and threatened to "break my limbs and arms and legs . . . and kill me". RPI, at 34. After initially refusing to meet Byrd, Lindemulder eventually revealed he was at his farm. Byrd denied threatening Lindemulder over the telephone and testified it was Lindemulder's idea to meet. Barbara Jarrett, who testified she was present with Byrd during the telephone conversation and transcribed what was said, stated Byrd did not threaten Lindemulder.

That evening Byrd, carrying a loaded pistol under a heavy coat, went to Lindemulder's farm. Byrd testified he brought the pistol because of John Lindemulder's reputation for owning and carrying guns. Byrd first encountered Lindemulder's brother Richard, who testified he thought Byrd had been drinking. Richard did not immediately tell Byrd of John's whereabouts, but after Byrd suggested John was "probably down screwing Jayne", Richard indicated John might be in his trailer. RPI, at 67. Byrd knocked on the door of John Lindemulder's trailer and Lindemulder let him in. Byrd and Lindemulder related different versions of the subsequent events.

Lindemulder testified Byrd accused him of "fooling around" with Jayne and threatened to cripple or kill him. After about one-half hour, during which Byrd made other threats, Byrd rose and went to the door. Instead of leaving, he took out his gun and put it to Lindemulder's head, pulled back the hammer, and told Lindemulder he was "history". Lindemulder sat motionless, believing Byrd would shoot him. After approximately 1 minute, Byrd lowered the hammer, put away the gun, and left the trailer. Lindemulder then called Jayne and told her what had happened; they met and went to the Duvall Police Station to report the incident.

Byrd testified his conversation with Lindemulder had been relatively calm. He expressed concern about the relationship between Lindemulder and Jayne Byrd and reminded Linde-

---

[1]RPI refers to the Report of Proceedings of October 15, 1990.

mulder of his history of "messing around" with other women. As Byrd stood in the doorway and was about to leave, he pulled his gun and held it in the air, warning Lindemulder if he continued "this type of thing" with women, someday something could happen to him. Byrd denied threatening Lindemulder or pointing the gun at him.

The King County police arrested Byrd at his house. They obtained a search warrant for the house and seized a .357-magnum revolver containing five live rounds in the cylinder and one empty round that had been fired. A police officer testified that, from the position of the bullets in the gun, it appeared the gun had been fired and then the hammer cocked to move another live round beneath the hammer.

James Byrd was charged by information with one count of assault in the second degree, with a special deadly weapon allegation. The jury returned a verdict of guilty as charged and Byrd was sentenced to 15 months in prison.

At trial Byrd took exception to the second paragraph of jury instruction 8, which defined assault as follows:

> An assault is an act, with unlawful force, done with intent to inflict bodily injury upon another, tending, but failing to accomplish it, and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted, but it is sufficient if an apprehension and fear of bodily injury is created in another.
>
> An assault is also an intentional act, with unlawful force, which creates in another a reasonable apprehension and fear of bodily injury, even though the actor did not actually intend to inflict bodily injury.

Clerk's Papers, at 53. This instruction mirrors the first and third paragraphs of former WPIC 35.50.[2] Byrd argued the

---

[2]The first and third paragraphs of former WPIC 35.50, in effect at the time of Byrd's trial, read as follows:

[An assault is an act, with unlawful force, done with intent to inflict bodily injury upon another, tending, but failing to accomplish it, and accompanied with the apparent present ability to inflict the bodily injury if not prevented. [It is not necessary that bodily injury be inflicted, but it is sufficient if an apprehension and fear of bodily injury is created in another.]]

. . . . [An assault is [also] an intentional act, with unlawful force, which creates in another a reasonable apprehension and fear of bodily injury even though the actor did not actually intend to inflict bodily injury.]

second paragraph of instruction 8 impermissibly instructed the jury it could convict him of assault without finding he intended to cause fear or apprehension of bodily injury.

The Court of Appeals reversed Byrd's conviction, holding the challenged instruction failed to instruct the jury as to an essential element of second degree assault, thereby unconstitutionally relieving the State of its burden of proving Byrd intended to inflict bodily injury or to cause apprehension and fear of bodily harm. *State v. Byrd*, 72 Wn. App. 774, 776-78, 868 P.2d 158 (1994). The court found the second paragraph of instruction 8 referred only to an intentional act that *results* in creating in another a reasonable apprehension and fear of bodily injury, rather than an act done with the *intent* to create in another a reasonable apprehension and fear of bodily injury. *Byrd*, 72 Wn. App. at 780-81.

The State petitioned this court for review, arguing the instructions were legally sufficient and did not relieve the State of its burden of proving the Defendant intended to create fear and apprehension in the mind of his victim. Two issues thus are before us:

1. Does assault in the second degree, under the relevant definition of assault, require specific intent to create in another apprehension of bodily harm?

2. If so, do the jury instructions given in this case fairly convey that requirement?

---

Former WPIC 35.50 ¶¶1, 3, at 199 (1977). The third paragraph of WPIC 35.50 subsequently was changed to read as follows:

[An assault is [also] an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.]

WPIC 35.50 ¶ 3, at 453 (2d ed. 1994). Courts are instructed to use paragraph 3 in cases in which there is evidence that the actor's intent was not to inflict bodily injury but only to create the apprehension or fear of bodily injury in the victim. WPIC 35.50 note on use, at 454. This definition was changed in response to *State v. Austin*, 59 Wn. App. 186, 796 P.2d 746 (1990), which cautioned that the former instruction could be misconstrued as relieving the State of its burden of proving that the defendant intended to cause apprehension of bodily harm. WPIC 35.50 cmt., at 455 (citing *Austin*, 59 Wn. App. at 194 n.4).

ANALYSIS

I

■ Assault in the second degree is defined by statute as follows, in pertinent part:

> (1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:
>
> . . . .
>
> (c) Assaults another with a deadly weapon; . . .

RCW 9A.36.021(1). Because "assault" is not defined in the statute, courts resort to the common law for definitions. *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 504, 125 P.2d 681 (1942); *State v. Krup*, 36 Wn. App. 454, 457, 676 P.2d 507, *review denied*, 101 Wn.2d 1008 (1984). *See also* RCW 9A.04.060 (common law provisions supplement criminal statutes).

■ We have recognized two apposite definitions of criminal assault. The first definition, of long standing, is "an attempt, with unlawful force, to inflict bodily injury upon another, accompanied with the apparent present ability to give effect to the attempt if not prevented". *Howell v. Winters*, 58 Wash. 436, 438, 108 P. 1077 (1910). *See also Guffey v. State*, 103 Wn.2d 144, 149, 690 P.2d 1163 (1984); *State v. Stewart*, 73 Wn.2d 701, 703, 440 P.2d 815 (1968); *State v. Alvis*, 70 Wn.2d 969, 971, 425 P.2d 924 (1967); *State v. Rush*, 14 Wn.2d 138, 139, 127 P.2d 411 (1942); *Peasley*, 13 Wn.2d at 505.[3] More recently, we recognized a second definition of assault:

> [A]n assault is "committed merely by putting another in apprehension of harm whether or not the actor actually intends to inflict or is incapable of inflicting that harm." The

---

[3]Consummation of an assault, *i.e.*, battery, also constitutes assault. *See, e.g., State v. Salinas*, 87 Wn.2d 112, 121, 549 P.2d 712 (1976); *Reese v. Seattle*, 81 Wn.2d 374, 386, 503 P.2d 64, 83 A.L.R.3d 157 (1972), *cert. denied*, 414 U.S. 832, 38 L. Ed. 2d 67, 94 S. Ct. 169 (1973); *State v. Miles*, 77 Wn.2d 593, 600-01, 464 P.2d 723 (1970); *State v. Johnson*, 23 Wn.2d 751, 753, 162 P.2d 440 (1945); *State v. Daniels*, 56 Wn. App. 646, 784 P.2d 579, *review denied*, 114 Wn.2d 1015 (1990); *State v. Murphy*, 7 Wn. App. 505, 510-11, 500 P.2d 1276, *review denied*, 81 Wn.2d 1008 (1972). This definition is reflected in subsections (a), (b), (d), (e), and (g) of RCW 9A.36.021(1), none of which is at issue in this case.

concept is thought to have been assimilated into the criminal law from the law of torts. It is usually required that the apprehension of harm be a reasonable one.

*State v. Frazier*, 81 Wn.2d 628, 631, 503 P.2d 1073 (1972) (quoting *United States v. Rizzo*, 409 F.2d 400, 403 (7th Cir.), *cert. denied*, 396 U.S. 911, 24 L. Ed. 2d 187, 90 S. Ct. 226 (1969)).

This second definition of assault applies in James Byrd's conviction. Under this definition, the State must prove the Defendant acted with an intent to create in his or her victim's mind a reasonable apprehension of harm. *State v. Austin*, 59 Wn. App. 186, 192-93, 796 P.2d 746 (1990); *Krup*, 36 Wn. App. at 458-59. This requirement is summarized in a passage quoted in both *Austin* and *Krup*:

A majority of jurisdictions have extended the scope of the crime of assault to include, *in addition to* (not as an alternative to) the attempted-battery type of assault, the tort concept of the civil assault, which is committed when one, with intent to cause a reasonable apprehension of immediate bodily harm (though not to inflict such harm), does some act which causes such apprehension. It is sometimes stated that this type of assault is committed by an act (or by an unlawful act) which reasonably causes another to fear immediate bodily harm. This statement is not quite accurate, however, for one cannot (in those jurisdictions which have extended the tort concept of assault to criminal assault) commit a criminal assault by negligently or even recklessly or illegally acting in such a way (as with a gun or a car) as to cause another person to become apprehensive of being struck. *There must be an actual intention to cause apprehension, unless there exists the morally worse intention to cause bodily harm.*

(Footnotes omitted. Italics ours.) Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* 611 (1972). *See Krup*, 36 Wn. App. at 458-59; *Austin*, 59 Wn. App. at 192-93. We agree and hold specific intent either to create apprehension of bodily harm or to cause bodily harm is an essential element of assault in the second degree.

## II

The State must prove every essential element of a crime beyond a reasonable doubt for a conviction to be upheld. *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368,

90 S. Ct. 1068 (1970); *State v. A costa*, 101 Wn.2d 612, 615, 683 P.2d 1069 (1984); *State v. McCullum*, 98 Wn.2d 484, 493-94, 656 P.2d 1064 (1983); *State v. Green*, 94 Wn.2d 216, 224, 616 P.2d 628 (1980). It is reversible error to instruct the jury in a manner that would relieve the State of this burden. *State v. Allen*, 101 Wn.2d 355, 358, 678 P.2d 798 (1984); *State v. Roberts*, 88 Wn.2d 337, 340, 562 P.2d 1259 (1977); *Austin*, 59 Wn. App. at 192. Therefore, the instructions, taken in their entirety, must inform the jury that the State bears the burden of proving James Byrd acted with an intent either to create in John Lindemulder's mind a reasonable apprehension of harm or to cause bodily harm. *See State v. Schulze*, 116 Wn.2d 154, 167-68, 804 P.2d 566 (1991); *State v. Bland*, 71 Wn. App. 345, 350-51, 860 P.2d 1046 (1993).

The State argues the jury was instructed properly as to intent, referring to instruction 7: "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result which constitutes a crime". Clerk's Papers, at 52. The State maintains the "result" referred to in this instruction is that defined in the second paragraph of instruction 8, *i.e.*, that the act complained of must have had as its objective or purpose to "create[] in another a reasonable apprehension and fear of bodily injury". Clerk's Papers, at 53. Therefore, the State contends instructions 7 and 8, taken together with the other instructions, properly instructed the jury on the appropriate definition of intent and clearly placed on the State the burden of proving intent.

The Court of Appeals rejected this argument, concluding the jury could have been confused about intent, based on the jury instructions received, and given Byrd's theory of the case. The defense's theory was that Byrd, by drawing his gun but not pointing it at Lindemulder, committed the crime of unlawful display of a weapon, in violation of RCW 9.41-.270.[4] The Court of Appeals found the instructional error

---

[4]Unlawful display, a gross misdemeanor, is defined in former RCW 9.41.270(1) as follows:

misleading and prejudicial because it failed to distinguish adequately between the intent required for second degree assault and that required for unlawful display. *Byrd*, 72 Wn. App. at 781. With proper instructions, the court concluded, the jury could have found Byrd guilty only of unlawful display because his words indicated only an intent to intimidate, not to cause apprehension or fear of bodily injury. *Byrd*, 72 Wn. App. at 778, 781.

The State suggests the Court of Appeals overlooked the direct testimony of John Lindemulder and contends the jury readily could have distinguished between second degree assault and unlawful display. Because the intent requirement was not set forth clearly in the jury instructions, this argument is not persuasive. The jury had conflicting evidence as to the events that occurred when Byrd confronted Lindemulder on the evening of February 13, 1990. If the jury believed Lindemulder's testimony, it could have found Byrd intended to create in Lindemulder apprehension of bodily harm, thus satisfying the intent element of second degree assault. If the jury believed Byrd's evidence, it could have found either that Byrd intended to cause present apprehension in Lindemulder or that Byrd intended only to intimidate Lindemulder; the latter intent is insufficient to support second degree assault. *See Byrd*, 72 Wn. App. at 778. However, the jury was not instructed that the defendant must have intended to create in his or her victim apprehension of bodily harm. Therefore, the jury may not have understood it must acquit Byrd of second degree assault if it failed to find he intended to create present apprehension in Lindemulder, because an essential element would not have been proved:

> It is not enough to instruct a jury that an assault requires an intentional unlawful act because, given the circumstances, Byrd's act of drawing the gun could be found to be an unlawful intentional act. Even where an act is done unlawfully and the result is reasonable apprehension in another, it still is not

---

"It shall be unlawful for anyone to carry, exhibit, display or draw any firearm . . . in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons."

sufficient to convict because the act must be accompanied by an actual intent to cause that apprehension. This is the required element about which the jury was never told.

*Byrd*, 72 Wn. App. at 780.

Consequently, even if the jury had found there was no intent to cause reasonable apprehension of bodily harm, the trial court's instructions permitted it to return a verdict of guilty of second degree assault. In this way, the trial court's instructional error impermissibly removed the element of intent from the jury. This is reversible error. *Allen*, 101 Wn.2d at 358; *Roberts*, 88 Wn.2d at 340; *Austin*, 59 Wn. App. at 192.

## CONCLUSION

Specific intent is an essential element of the second degree assault charge against the Defendant. Under the theory of the case argued at trial, the State must prove beyond a reasonable doubt that James Byrd intended to create in John Lindemulder's mind a reasonable apprehension of harm. By failing to set forth clearly the intent requirement for second degree assault, the trial court impermissibly removed the element of intent from the jury. This is reversible error.

We affirm the Court of Appeals and remand to the trial court for proceedings consistent with this opinion.

DURHAM, C.J., UTTER, DOLLIVER, SMITH, GUY, and MADSEN, JJ., and ANDERSEN and BRACHTENBACH, JJ. Pro Tem., concur.