**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 83075-9-I |
| RICKY MARVIN ARNTSEN, | DIVISION ONE |
| Petitioner. | PUBLISHED OPINION |

COBURN, J. — Ricky Arntsen, through a personal restraint petition (PRP), once again challenges his conviction for assault in the second degree. Unlike unlawful display of a weapon, assault in the second degree required the jury to find both that Arntsen had the specific intent to create reasonable fear and apprehension of bodily injury and in fact did create a reasonable apprehension and imminent fear of bodily injury. While intent may be inferred from pointing a firearm at another, that did not occur here. We are left to determine whether the evidence sufficiently established that Arntsen did more than merely display a rifle, allowing a jury to infer, without speculating, that he had the requisite intent. We hold that it did not. We also hold that the evidence did not establish that Arntsen did in fact create an imminent fear of bodily injury. We grant the petition, reverse the conviction, and remand to the trial court to vacate.

Citations and pin cites are based on the Westlaw online version of the cited material

FACTS

Kim Koenig was commuting to work one morning in December 2014. Koenig drove northbound on Auburn Way, a road with two lanes for traffic and one center turning lane. As Koenig approached an intersection, she came upon an older model gray Jaguar, driven by Arntsen,[1] which was in the lane closest to the turning lane. Koenig noticed the Jaguar had its blinker on to move into the right lane and was backing up traffic. Koenig "made a maneuver" in front of the Jaguar. Koenig then noticed that Arntsen, while still behind her, started driving aggressively with her like she had made him very mad. Koenig testified that it was hard to describe, but said Arntsen started to "attack" Koenig's vehicle with his own by driving up to her and stopping just short of hitting her car. He then moved into the lane next to Koenig, "acting like he wanted to hit me from the other side." Koenig testified that Arntsen had his window rolled down and was yelling and gesturing, pointing to the side of the road, like he wanted Koenig to get off the road. Koenig could not hear what Arntsen was saying and tried to avoid looking at him during this exchange in an attempt to avoid aggravating him further. Arntsen continued "flailing" his arms and yelling at Koenig as they proceeded down the road for "a few minutes or seconds."

Arntsen then sped up, positioned his car in front of Koenig's, "threw his car into a turn," slammed his brakes and came to a stop diagonally, blocking the lanes of traffic. Koenig stopped on the road, putting "as much distance" as she

---

[1] Arntsen maintains that he was not the driver, but for the purposes of this petition, he does not challenge identity.

No. 83075-9-I/3

could between herself and Arntsen's vehicle.[2]

Arntsen then opened his driver's side door and exited. Arntsen had covered his face with a kerchief like an "old bank robber movie" and was holding a rifle.[3] Arntsen walked toward Koenig's car carrying the rifle, but never pointed it at her. Koenig immediately called 911 and averted her eyes and focused on talking to the 911 operator. Based on just peripheral vision and her feelings, she "felt like he had come up on the driver's side" very close to her vehicle before looking up and seeing him walk back towards his car.

Witness Robert Morrill, who was trying to drive around the backed-up traffic on the right, saw Arntsen's actions from the time he stepped out of his vehicle until he left the scene. Arntsen had the gun held straight up in one hand as he, according to Koenig, walked up to the driver's side door of the passenger car.[4] Arntsen then moved the rifle from its upward position in one hand down to his waist where he held it with two hands. Morrill saw the driver of the jaguar run up to the driver's side of the passenger car that was blocked by the jaguar, turn

---

[2] This court's previous opinion, which addressed different issues, described Koenig as being "forced off the road by a man driving an older, grayish Jaguar." State v. Arntsen, No. 76912-0-I, slip op. at 3 (Wash. Ct. App. Jan. 6, 2020) (unpublished), www.courts.wa.gov/opinions/pdf/769120.pdf. While Arntsen blocked Koenig from continuing to drive on the road, Koenig's car never left the roadway.

[3] Witnesses gave conflicting descriptions of the type of rifle used. Koenig said it appeared to be a "deer hunting rifle" and not an "assault-style rifle." Passing motorist, Robert Morrill, however, stated that it appeared to be an "AK-47." The State alleged the deadly weapon used in the assault in the second degree was a "rifle."

[4] Arntsen notes that Morrill described the vehicle as a "passenger car" when Koenig was driving a Dodge Caravan, and that Morrill described the person in the car as a "man" when Koenig is referred to in the record with female gender pronouns. Describing the vehicle as a passenger car does not mean that it was not the Caravan driven by Koenig. The record establishes that Morrill used the term "man" generically as he testified that he could not see who was in the car.

3

around, run back to his car, jump in and "t[ake] off." It happened very quickly and Morrill could not hear what, if anything was said. Morrill never saw the driver of the vehicle point the rifle at anyone in the car.

Arntsen was subsequently charged by amended information with 17 counts based on this event and unrelated events that occurred before and after this road rage incident. The events before and after this incident are not relevant to this appeal. Two counts, naming Kim Weyer Koenig as the victim, were based on the road rage incident. Count 2 alleged assault in the second degree with a deadly weapon, the rifle, under RCW 9A.36.021(1)(c). Count 3 alleged felony harassment. Arntsen represented himself at trial.

Koenig testified at trial that when Arntsen first exited his vehicle with the rifle, Koenig's initial thought was that she was going to get shot because she saw Arntsen had a rifle and Koenig thought "Why in the world would you have a gun unless you were going to use it?" She further explained that though she believed Arntsen meant to do her harm, "What kind of harm he meant to do, I don't know. Whether or not I was going to be shot, whether or not he was going to assault me, steal my vehicle, I had no idea." When Arntsen approached and got close to Koenig's car, she explained that "he was not looking to shoot me, he did the [sic] not raise the gun like, you know, he wanted to shoot me. He had something else in mind. I have no idea what it was. I still don't know what it was."

In addition to Morrill testifying that he observed Arntsen run up to the passenger car, the State asked Morrill if he could "describe the demeanor or the appearance of the individual that got out of the car with the firearm?" Morrill said,

4

No. 83075-9-I/5

"Aggressive.  Scary Aggressive."

The jury was instructed on both assault in the second degree with a deadly weapon and the lesser included offense of unlawful display of a weapon. The jury found Arntsen not guilty of felony harassment[5] and guilty on all other counts, including assault in the second degree with a deadly weapon.  In his previous direct appeal, Arntsen challenged several convictions including the conviction for assault in the second degree, contending, among other issues, that the State did not prove that what he held was an actual rifle.  See Arntsen, No. 76912-0-I, slip op. at 15.  In that appeal, this court reversed one conviction for malicious mischief, but otherwise affirmed.  Id.

Following that decision, Arntsen submitted a pro se motion to vacate or amend judgment and sentence under CR 7.8 to the trial court.  See generally PRP.  Arntsen claimed that the evidence was insufficient to support his conviction for assault in the second degree because Arntsen only displayed the rifle and never pointed it at another person.  He also claimed the law of the case required the State to prove the victim's middle name was "Weyer."  Lastly, he claimed that prosecuting him violated his constitutional right to equal protection. The trial court transferred his motion to this court for consideration as a PRP.

---

[5] The jury was instructed that "A person commits the crime of felony harassment when he or she, without lawful authority, knowingly threatens to cause bodily injury immediately or in the future to another person, and when he or she, by words or conduct, places the person threatened in reasonable fear that the threat will be carried out and the threat to cause bodily harm consists of a threat to kill the threatened person or another person[.]"

5

No. 83075-9-I/6

DISCUSSION

A "petitioner in a personal restraint petition is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." In re Yates, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (quoting In re Pers. Restraint of Davis, 152 Wn.2d 647, 671, 101 P.3d 1 (2004)). "A petitioner may not avoid this requirement 'merely by supporting a previous ground for relief with different factual allegations or with different legal arguments.'" Id. at 17 (quoting In re Pers. Restraint of Davis, 152 Wn.2d at 671). The interests of justice are served by reconsidering a ground for relief if there has been "'an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application.'" Id. (internal quotation marks omitted) (quoting In re Pers. Restraint of Stenson, 142 Wn.2d 710, 720, 16 P.3d 1 (2001)).

While there was no intervening change in the law and Arntsen does not contend there was another justification for not raising the issue in his direct appeal, the actual innocence doctrine applies to this case. Ordinarily, the person bringing a habeas petition must show cause and prejudice in order to avoid state procedural bars to collateral attack. In re Carter, 172 Wn.2d 917, 923, 263 P.3d 1241 (2011) (citing Dretke v. Haley, 541 U.S. 386, 392, 124 S. Ct. 1847, 158 L. Ed. 2d 659 (2004)). Where a petitioner is alleging actual innocence to avoid a procedural bar that prevents judicial review of an alleged constitutional error, the petitioner's claim of actual innocence is a "gateway" to review by an appellate court. Id. at 924 (citing Schlup v. Delo, 513 U.S. 298, 315, 115 S. Ct. 851, 130 L.

6

Ed. 2d 808 (1995).

The actual innocence doctrine applies when a defendant can show by clear and convincing evidence that an alleged constitutional error resulted in the conviction of an actual innocent defendant and a "fundamental miscarriage of justice would otherwise result if the collateral attack is dismissed." Id. at 923. A defendant asserting an actual innocence claim must, at a minimum, make a threshold showing of innocence. In re Pers. Restraint of Weber, 175 Wn.2d 247, 260, 262-63, 284 P.3d 734 (2012).

A defendant's assertion of insufficient evidence asserts a constitutional error. In re Crow, 187 Wn. App. 414, 421, 349 P.3d 902 (2015). The State does not argue that Arntsen is procedurally barred from again raising a sufficiency claim. Here, because the jury convicted Arntsen of assault in the second degree with a deadly weapon based on mere display, as prohibited by State v. Eastmond, 129 Wn.2d 497, 502-03, 919 P.2d 577 (1996), overruled on other grounds by State v. Easterlin, 159 Wn.2d 203, 149 P.3d 366 (2006), Arntsen has met the minimum threshold showing of innocence as discussed below.

Standard of Review

Evidence is sufficient to support a criminal conviction if "after viewing the evidence in the light most favorable to the [prosecution], any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing State v. Green, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980)). "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." State v.

7

O'Neal, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). "Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient." Id. at 506.

Sufficiency of the Evidence

Arntsen contends that the State did not prove the requisite intent to support a conviction for assault in the second degree. "A person is guilty of assault in the second degree if he . . . under circumstances not amounting to assault in the first degree, assaults another with a deadly weapon." RCW 9A.36.021(1)(c). The trial court instructed the jury that an assault is "an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." To convict a defendant of assault in the second degree, the jury must find specific intent to create reasonable fear and apprehension of bodily injury. State v. Ward, 125 Wn. App. 243, 248, 104 P.3d 670 (2004) (citing State v. Byrd, 125 Wn.2d 707, 713, 887 P.2d 396 (1995)[6]). Such intent may be inferred from pointing a gun, but not from mere display of a gun. Eastmond, 129 Wn.2d at 500. The parties agree that Arntsen never pointed the rifle at Koenig.

Arntsen contends that while the evidence may support a conviction for unlawful display of a weapon, it is insufficient to prove that he had a specific intent to cause Koenig apprehension and fear of bodily injury and did in fact

---

[6] For clarity, we refer to State v. Byrd, 125 Wn.2d 707 as "Byrd II" because it followed State v. Byrd, 72 Wn. App. 774 which we refer to as "Byrd I."

No. 83075-9-I/9

create a reasonable apprehension and imminent fear of bodily injury. The unlawful display of a weapon statute provides:

> It shall be unlawful for any person to carry, exhibit, display, or draw any firearm, dagger, sword, knife or other cutting or stabbing instrument, club, or any other weapon apparently capable of producing bodily harm, in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons.

RCW 9.41.270(1).

The State concedes that the intent required for assault cannot be inferred from mere display, but argues that Eastmond does not preclude inferring intent from surrounding facts and circumstances beyond pointing the muzzle at the victim. The State argues that because the assault requires specific intent to target an individual and the unlawful display does not, this suggests that conduct targeting an individual can be sufficient to infer the requisite intent. In the instant case the State argues that a jury could have found such intent when Arntsen "attack[ed]" Koenig with his car forcing her to stop before advancing on her in a "'[s]cary aggressive' manner while brandishing his rifle." (alteration in original).

However, this court explained in Byrd I that

> [t]he gravamen of the offense of unlawful display of a weapon is displaying and handling of the weapon in a manner "that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons." RCW 9.41.270. The unlawful display statute recognizes that display of a weapon, without any required intent, could be done in a manner to cause reasonable apprehension, fear, or alarm. There is no necessary nexus between reasonable apprehension and the defendant's actual intent. Under some circumstances, apprehension could be reasonable at the mere sight of a firearm, while the defendant's intent could be completely innocent.

State v. Byrd, 72 Wn. App. 774, aff'd State v. Byrd, 125 Wn.2d. 707.

9

No. 83075-9-I/10

The State contends that pointing a firearm directly at a person is sufficient, but not necessary to establish an intent to cause fear of bodily injury. The State cites State v. Star[7] as an example. No. 35145-9-III, slip op. at 4 (Wash. Ct. App. Oct. 16, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/351459_unp.pdf. In Star, the defendant unsuccessfully challenged the sufficiency of the evidence supporting two convictions of assault in the second degree. Id. at 7. The defendant first attempted to approach a woman in a coffee shop and became angry when he was unable to get her attention. Id. at 2. He then sat next to her, swore at her and pointed a knife "directly at" her. Id. The woman escaped to an employee area to hide. Id. A second patron witnessed what happened and was calling 911 when the defendant "aggressively approache[d]" while "continuing to hold the knife out in front of him" and continued to yell profanities at this patron. Id. at 2-3 (alteration in original). Another witness testified that the defendant's conduct was such that he worried the defendant was going to use the knife. Id. at 3. In upholding the conviction, the Star court reasoned that a "rational jury could infer from the combination of the hostile verbal encounters, [the defendant's] visible agitation, and the wielding of the knife in a threatening manner directed at [the victims]" that Star approached them with the intent to put them in reasonable fear and apprehension of bodily harm." Id. at 7.

Star does not help the State. Unlike the defendant in Star, who wielded

---

[7] While unpublished opinions of the Court of Appeals have no precedential value, parties may cite them as nonbinding authorities if identified as unpublished and may be accorded such persuasive value as the court deems appropriate. GR 14.1(a).

10

No. 83075-9-I/11

the knife in a threatening manner directed at the victims, in the instant case Arntsen did not direct the rifle at Koenig. Koenig herself said Arntsen's conduct was such that she knew he did not want to shoot her and that she had "no idea" what he had in mind.

Contrary to the State's suggestion, directing intimidating conduct at someone does not necessarily establish sufficient evidence to support the requisite intent to support a conviction for assault in the second degree. See State v. Ward, 125 Wn. App. 243, 248, 104 P.3d 670 (2004), abrogated on other grounds by State v. Grier, 171 Wn.2d 17, 246 P.3d 1260 (2011); State v. Murphy, 7 Wn. App. 505, 512, 500 P.2d 1276 (1972).

In Ward, the owner and employee of a repossession company went to Ward's home to repossess his car. 125 Wn. App. at 246. One employee got out of the truck to attach the towing mechanism to the repossessed vehicle when Ward stood on the porch of his home and, according to the victims, pointed a gun at each of them while shouting for them to get away from the car and leave. Id. The defendant and his girlfriend testified that Ward told the two men he had a gun, ordered them to leave his property, and displayed the gun by opening his jacket, but never pointed it at the victims. Id. at 248. Ward's attorney did not offer the lesser included offense of unlawful display of a weapon. Id. at 247-48. The Ward court reversed the assault in the second degree conviction reasoning that a jury could have decided that Ward committed only unlawful display of a weapon if they "did not believe Ward acted lawfully, but doubted whether he pointed his gun." Id. at 249-50.

11

In Murphy, the defendant approached two Air Pollution Control Officers investigating his business, "bellowing and hollering," called them "some real first - class names," and told them to "get off [his property] . . . or there is going to be trouble" while unholstering his gun. 7 Wn. App. at 507. One of the control officers testified that the defendant pointed the gun at the officers. Id. at 508. The defendant testified that he held the gun at his side with this finger on the trigger, but never pointed it at the officers. Id. at 507. The defendant argued that because the given instructions did not include an intent element, the jury could still convict him of the crimes charged, even if they believed his testimony that he never pointed the gun at officers. Id. at 511. The Murphy court agreed and reversed the assault in the second degree conviction because the jury instruction failed to include the requisite intent element. Id. at 512.

In both Ward and Murphy, the defendants engaged in intimidating conduct directed at another even when accepting their version of events that denied pointing a gun at another.

Arntsen cites State v. Stokes, an unpublished case, to support his contention that the deadly weapon must be directed at another to support assault in the second degree. State v. Stokes, noted at 157 Wn. App. 1075 (2010). In Stokes, two men forced their way into a woman's home to rob her and hit her in the head with a gun in the presence of her two young children and also grabbed one child's shirt, asking the child where the money was. Stokes, 2010 WL 3760123 at *1. Stokes was convicted of two counts of attempted second degree assault for his conduct toward the two children. Id. at *2. The court reversed the

convictions. Id. at *1. The court noted the fact that there was no evidence that Stokes pointed the gun at the children, that one of the men threw a cape onto the children and told them to cover their faces, and, later, one of the men told the children to go into the bathroom. Id. The court reasoned that although Stokes' conduct "demonstrate[d] an intent to frighten the children and even a willingness to assault them, it does not show that Stokes actually attempted to commit second degree assault against the children." Id. at *3. The Stokes court did not consider only the fact that a gun was not pointed at the children.

Even when a gun is not directly pointed at another, other evidence may still suffice to allow a jury to find that the defendant had the sufficient intent to support assault in the second degree. See Byrd II, 125 Wn.2d at 713.

In Byrd II, the defendant carried a loaded pistol under a heavy coat and went to confront John Lindemulder, the person who was seeing Byrd's sister-in-law after the sister-in-law and Byrd's brother separated. Id. at 708-09. Lindemulder testified that Byrd threatened Lindemulder and put a gun to his head. Id. at 709. The Supreme Court observed that if the jury believed Lindemulder, it could have found Byrd intended to create apprehension of bodily harm, thus satisfying the intent element of second degree assault. Id. at 715. What is relevant in our analysis is the Supreme Court's analysis if the jury were to believe Byrd's testimony.

Byrd testified that he expressed concern about the relationship, reminded the person about his history of messing around with other women, and as Byrd stood in the doorway and was about to leave, pulled his gun and held it in the air,

warning the person that if he continued this type of thing with women, someday something could happen to him.  Id. at 709-10.  Byrd denied threatening the person or pointing a gun at him.  Id. at 710.  The Byrd II court held that "if the jury believed Byrd's evidence," "it could have found *either* that Byrd intended to cause present apprehension in Lindemulder *or* that Byrd intended to only intimidate Lindemulder; *the latter intent is insufficient to support second degree assault*."  Id. at 715 (emphasis added).  The Supreme Court affirmed this court's decision to reverse the conviction because the jury was not instructed that the defendant must have intended to create in his or her victim apprehension of bodily harm.  Id. at 715-16.

In the instant case, the jury was properly instructed and was given the option of convicting on the lesser included instruction of unlawful display of a weapon.  Thus, the question before us is whether the evidence sufficiently supported inferring the requisite intent beyond speculation.  It is important to remember that "[w]hether or not the victim's apprehension is 'reasonable' involves considerations not directly related to a defendant's specific intent to cause apprehension. The required intent involves the mental processes of the defendant, whereas the 'reasonableness' of the victim's reaction involves the victim's mental processes."  Byrd I, 72 Wn. App. at 779-80.

A verdict does not rest on speculation or conjecture when founded on reasonable inferences drawn from circumstantial facts.  State v. Jameison, 4 Wn. App. 2d 184, 197-98, 421 P.3d 463 (2018) (citing State Farm Mut. Ins. Co. v. Padilla, 14 Wn. App. 337, 339-40, 540 P.2d 1395 (1975)).  "This proposition

14

conversely suggests that an inference is not reasonable if based on speculation or conjecture." Id. at 198. "When evidence is equally consistent with two hypotheses, the evidence tends to prove neither." Id. "Washington law, if not the federal constitution, demands that inferences in the criminal setting be based only on likelihood, not possibility. When an inference supports an element of the crime, due process requires the presumed fact to flow more likely than not from proof of the basic fact." Id. at 200 (citing State v. Hanna, 123 Wn.2d 704, 710, 871 P.2d 135 (1994). "Whether an inference meets the appropriate standard must be determined on a case-by-case basis in light of the particular evidence presented to the jury in each case." Id.

In Byrd II, even if the jury were to only accept the defendant's version of events, not only did he direct intimidating behavior toward another, he made statements, while pulling out a gun and raising it in the air, that something could happen to Lindemulder if he continued his behavior. That is not the circumstance in the instant case.

Following a road rage incident, Arntsen got out of his car with his face partially covered and holding a rifle. He approached Koenig's car without ever pointing the rifle at her, walked or ran up to the driver's side door and then walked or ran back to his own vehicle and left. To conclude that this evidence sufficiently supports assault in the second degree dangerously allows unconscious bias to creep into the process. Without any evidence as to what Arntsen said, the jury is left with what he did and what he looked like. When evidence of someone's conduct leaves an unanswered question as to what the

15

person actually intended, what is left is what the person looked like. The State elicited from Morrill, without any further explanation, that he thought Arntsen appeared "[s]cary aggressive."

As this court previously explained, which is worth repeating here, the law "recognizes that display of a weapon, without any required intent, could be done in a manner to cause reasonable apprehension, fear, or alarm. There is no necessary nexus between reasonable apprehension and the defendant's actual intent." Byrd I, 72 Wn. App. at 780.

The State was required to prove beyond a reasonable doubt that Arntsen assaulted Koenig, meaning in this circumstance that he specifically intended to create in Koenig apprehension and fear of bodily injury. We hold that the evidence did not sufficiently allow the jury, without speculating, to find that Arntsen had such intent.

Also, in order to find that Arntsen committed assault, the State not only had to prove that Arntsen had the intent to create in another apprehension and fear of bodily injury, but that he in fact created in another a reasonable apprehension and imminent fear of bodily injury. When Koenig first saw Arntsen step out of his car with a rifle, she testified that she initially believed he meant to do her "harm" but had "no idea" what type of harm. She further explained that when Arntsen approached her vehicle, she said Arntsen "was not looking to shoot" her, and that "[h]e had something else in mind," though she had "no idea what it was." The evidence did not sufficiently support that Arntsen did in fact create in Koenig an imminent fear of bodily injury.

16

No. 83075-9-I/17

CONCLUSION

Under the facts of this case, we hold that the evidence is insufficient to support the conviction of assault in the second degree. We need not address Arntsen's other arguments and grant the petition. We reverse the conviction and remand to the trial court to vacate.

Coburn, J.

WE CONCUR:

17