[No. 21833-3-III.   Division Three.   July 13, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN RALPH SANCHEZ, SR., *Appellant*.

*William D. Edelblute*, for appellant.

*Ronald S. Zirkle, Prosecuting Attorney*, and *Kenneth L. Ramm, Deputy*, for respondent.

BROWN, J. — A jury found John Ralph Sanchez, Sr., guilty of a single count of second degree assault; two counts of assault in violation of a protection order, domestic violence; one count of second degree driving while license suspended or revoked; one count of resisting arrest; and one count of attempting to elude a pursuing police vehicle. Although the jury found Mr. Sanchez guilty of assault in violation of a protection order in its general verdict form, it did not find an assault in its special verdict form. Mr. Sanchez appealed alleging (1) the

trial court compelled him to wear his jail uniform during trial, (2) the "to convict" instruction for assault in violation of a protection order omitted the essential element of an actual assault, (3) the general verdict and special verdict were inconsistent, (4) the trial court erroneously gave a single "to convict" instruction for two separate counts, (5) the trial court failed to read a specific intent instruction to the jury, (6) there was insufficient evidence of assault in violation of a protection order, (7) counsel was ineffective, and (8) cumulative error warranted reversal. The State concedes that the "to convict" instruction for assault in violation of a protection order was erroneous. The failure to recite an instruction to the jury appears to be an issue of first impression. We reverse the assault convictions on that issue. We also conclude there was insufficient evidence to support the two convictions for assault in violation of protection orders. We affirm all other convictions.

## FACTS

The State charged Mr. Sanchez with seven counts: (1) second degree assault; (2) assault in violation of a protection order, domestic violence, willful violation of a protection order in the alternative; (3) assault in violation of a protection order, domestic violence, willful violation of a protection order in the alternative; (4) first degree malicious mischief, domestic violence; (5) second degree driving while license suspended or revoked; (6) resisting arrest; and (7) attempting to elude a pursuing police vehicle. Mr. Sanchez underwent a mental health evaluation at Eastern State Hospital and was found competent to stand trial.

The State agreed to dismiss Count 4, first degree malicious mischief. Trial proceeded on the six remaining counts. On the morning of trial, Mr. Sanchez unsuccessfully requested a new attorney and opined, "[t]here's no use in doing it because it's already a lost cause anyway." Report of Proceedings (RP) (Jan. 28, 2003) at 2. In response to Mr. Sanchez's concerns, defense counsel partly stated:

He's frustrated. He doesn't have his clothes this morning, but he never asked me about that issue and we intend to say that that's part of the package here, that his family has turned on him, essentially, in many ways, and that no one bailed him, no one brought him clothes, no one visited him while he was here, and paint that picture for the jury.

RP (Jan. 28, 2003) at 3.

Elsie Sanchez, Mr. Sanchez's former wife, testified that while she was riding in a car with a friend, Mr. Sanchez blocked the road in front with his car and approached her stopped vehicle while shouting and yelling. Ms. Sanchez said she warned her former husband he was violating a restraining order. Ms. Sanchez and her friend drove away. Mr. Sanchez pursued, throwing a beer can at them. The pursuit ended when Mr. Sanchez damaged his car on a curb. Ms. Sanchez then testified that after filing a report at the police station, Mr. Sanchez, driving another car, tried to cut her off again. Ms. Sanchez pointed out Mr. Sanchez's car to an officer who was following her home.

Yakima police officer Raphael Sanchez testified he talked to Ms. Sanchez at the police station. He confirmed that a no-contact order existed between Mr. Sanchez and Ms. Sanchez. The officer then followed Ms. Sanchez home and witnessed the second confrontation where Mr. Sanchez tried to cut off Ms. Sanchez's vehicle. Officer Sanchez followed Mr. Sanchez's vehicle and signaled him to stop. Mr. Sanchez made an obscene gesture and sped off.

Officer Sanchez pursued Mr. Sanchez, who swerved across lanes of traffic at a high speed. Twice during the pursuit, Mr. Sanchez slammed on his brakes, forcing the officer to do the same, and then sped off again, one time waving at the officer to follow. Twice during the chase, Mr. Sanchez did a U-turn and drove toward the officer, once forcing the officer to take evasive action. Mr. Sanchez reached speeds up to 95 and 105 miles per hour. And at one point, Mr. Sanchez drove in the opposite lane of traffic.

Mr. Sanchez and the police vehicle collided when Mr. Sanchez tried to do another U-turn. The officer ordered Mr.

Sanchez out of the vehicle at gunpoint. Mr. Sanchez ran around encouraging the officer to shoot him. The officer reholstered his handgun when he determined Mr. Sanchez was not armed.

Mr. Sanchez then fled on foot for about 50 yards until the officer caught up to him. Mr. Sanchez then challenged the officer to fight while the officer tried without success to get him to submit to arrest. Mr. Sanchez finally gave up when other police vehicles arrived. After the arrest, Officer Sanchez discovered Mr. Sanchez had been driving with a suspended license. In cross-examination, Officer Sanchez characterized Mr. Sanchez's behavior "as suicidal" and "[s]uicide by cop." RP (Jan. 28, 2003) at 49.

Yakima Police Detective James Fuehrer testified he was dispatched to help with the vehicle pursuit. Later, Detective Fuehrer drove Mr. Sanchez to the hospital for a prebooking medical evaluation. After arriving at the hospital, Mr. Sanchez first refused to get out of the patrol car. While they were waiting for the medical examination to begin, Mr. Sanchez spontaneously told the detective "that he wanted to turn his vehicle around in a u-turn and take Officer Sanchez head on in an attempt to take his own life." RP (Jan. 28, 2003) at 64. The detective recalled Mr. Sanchez claiming that he had wanted to take his own life "for about 15 years." RP (Jan. 28, 2003) at 66.

Recalled to the stand, Officer Sanchez testified he took evasive action when Mr. Sanchez drove at him because of personal safety concerns.

Mr. Sanchez took the stand in his own defense and admitted driving with a suspended license, confronting Ms. Sanchez in his car, and yelling at her. Mr. Sanchez said he did not stop for Officer Sanchez because he "didn't care anymore." RP (Jan. 28, 2003) at 77. He admitted doing a U-turn and driving at the patrol car but insisted he did not mean to hurt the officer, but rather himself. He said he told the officer to shoot him "[b]ecause I was tired." RP (Jan. 28, 2003) at 78. He said he did not wear a seat belt during the car chase. And he said he told Detective Feuhrer that "ever

since I was 15, I've been wanting to die." RP (Jan. 28, 2003) at 78.

In cross-examination, Mr. Sanchez conceded that at the time of his arrest he was subject to a domestic violence no-contact order prohibiting any contact with Ms. Sanchez. And he admitted confronting Ms. Sanchez twice on the relevant date.

Mr. Sanchez testified he understood he was supposed to stop when he saw the flashing lights of the police car. And he said he understood that driving his car head-on into another car might hurt a person other than himself.

Mr. Sanchez did not challenge any of the proposed jury instructions. Although the State charged Mr. Sanchez with two separate counts of assault in violation of a protection order, the trial court gave the jury a single "to convict" instruction (Instruction No. 20) as follows:

> To convict the defendant of the crime of Violation of a Protection order, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about July 28, 2002, the defendant violated the provisions of a protection order that excluded him from the residence, workplace, school or day care or restrain that person from committing acts of domestic violence or having contact with Elsie Sanchez;
>
> (2) That the defendant knew of the existence of the protection order; and
>
> (3) That the acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 52.

When the trial court read the instructions to the jury, it skipped over Instruction No. 5, which defined assault. Instruction No. 5 states:

An assault is an intentional touching or striking of another person, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive.

An assault is also an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

An assault is also an act, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the act did not actually intend to inflict bodily injury.

An act is not an assault, if it is done with the consent of the person alleged to be assaulted.

CP at 36.

In his closing argument, defense counsel partly stated:

This is a life in disarray. It's a life that is subject to power and control, the power and control of a bad divorce that ended a long relationship, financially ruined one person and left him standing out in the street early in the morning, no shirt, no shoes, yelling at his ex-wife coming back from a vacation at Lake Chelan with her friend, euphemistically calls her friend, and then because, try as he might, that power and control still exists and all he wants, I don't care anymore.

RP (Jan. 29, 2003) at 13.

The jury found Mr. Sanchez guilty on all six remaining charges. Regarding Counts 2 and 3, the jury entered two separate verdicts finding Mr. Sanchez guilty "of the crime of Assault in Violation of a Protection Order." CP at 25. However, on a special verdict form, the jury answered "no" as to whether Mr. Sanchez's violation of a protection order was an assault that did not amount to a second degree assault, and answered "yes" as to whether Mr. Sanchez had been twice before convicted of violating a protection order. CP at 21. The trial court sentenced Mr. Sanchez to concur-

rent terms totaling 29 months, the top end of the standard range for assault in violation of a protection order. Mr. Sanchez appealed.

## ANALYSIS

### Jail Clothing

The issue is whether under Fourteenth Amendment due process principles Mr. Sanchez is entitled to a new trial because he appeared in jail clothing.

■■ "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976) (citing *Drope v. Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975)). "The State cannot, consistent with the rights guaranteed by the Fourteenth Amendment, compel a defendant to stand trial before a jury dressed in jail attire identifiable by a jury as such." *State v. Stevens*, 35 Wn. App. 68, 70, 665 P.2d 426 (1983) (citing *Estelle*, 425 U.S. at 504-06).

"[T]he particular evil proscribed is compelling a defendant, against his will, to be tried in jail attire. The reason for this judicial focus upon compulsion is simple; instances frequently arise where a defendant prefers to stand trial before his peers in prison garments." *Estelle*, 425 U.S. at 507-08. In this connection, having the defendant appear in jail clothing in order to elicit sympathy from the jury is a recognized defense tactic. *Id.* at 508.

"Courts have therefore required an accused to object to being tried in jail garments, just as he must invoke or abandon other rights." *Id.*

Accordingly, although the State cannot consistently with the Fourteenth Amendment compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the

presence of compulsion necessary to establish a constitutional violation.

*Id.* at 512-13.

*Estelle* and *Stevens* are illustrative. In *Estelle*, the defendant raised the clothing issue with the jail attendant, and defense counsel mentioned the defendant's jail attire in voir dire, but at no time did the defendant voice an objection to the trial court. *Estelle*, 425 U.S. at 509-10. The Supreme Court held no evidence of compulsion existed and the defendant's failure to object precluded any suggestion of compulsion. *Id.* at 512.

In *Stevens*, the defendant was given the choice to wear jail clothing or the clothes he wore at the time of arrest. *Stevens*, 35 Wn. App. at 69. The trial court continued the trial for a day. *Id.* The next day the defendant appeared in jail garb complaining his street clothing was dirty. *Id.* The trial court refused another requested continuance and proceeded with a two-day trial. *Id.* Division One of this court, noting the choice allowed the defendant and that the defendant had sufficient time to have the clothes cleaned before the first and second days of trial, held the defendant was not compelled to wear jail clothing. *Id.* at 71.

Here, Mr. Sanchez did not voice an objection to the trial court. *See Estelle*, 425 U.S. at 509-10. Defense counsel noted Mr. Sanchez's unhappiness with appearing in jail clothing but expressly made a tactical decision for him to present Mr. Sanchez before the jury in what he hoped would be a sympathetic light. *See id.* at 510 n.5 (observing under the facts of the case that "a desire to elicit jury sympathy would have been a reasonable approach"). Under this record, we cannot conclude Mr. Sanchez was compelled to appear in jail clothing. *See id.* at 512; *Stevens*, 35 Wn. App. at 71. We will revisit the issue in our discussion of the ineffective representation issue.

## Failure to Read Instruction

The issue is whether the trial court committed reversible error when it failed to read to the jury the instruction

defining assault. This appears to be an issue of first impression in this State.

■ Mr. Sanchez did not object below; therefore, this court will not review the matter unless it meets one of the criteria set forth in RAP 2.5(a). *See State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). Mr. Sanchez contends the error is reviewable as a manifest error affecting a constitutional right. RAP 2.5(a)(3); *see McFarland*, 127 Wn.2d at 333-34.

■ The applicable court rule expressly states the trial court "shall read the instructions to the jury." CrR 6.15(d). Nothing in the rule indicates that the term "shall" conveys anything other than a mandatory intent. *See State v. Marking*, 100 Wn. App. 506, 510-11, 997 P.2d 461 (discussing the mandatory effect of "shall" in a statute), *review denied*, 141 Wn.2d 1026 (2000). In other words, the rule means what it says; the trial court has a mandatory duty to read the written instructions to the jury. *See id.* at 511. Consequently, the trial court erred when it skipped over Instruction No. 5 while it was reading the instructions to the jury.

Other jurisdictions have reached the same result. *See, e.g., People of the Territory of Guam v. Marquez*, 963 F.2d 1311, 1314-15 (9th Cir. 1992) ("all jury instructions must be read aloud to the jury in the presence of counsel and the defendant"); *United States v. Noble*, 155 F.2d 315, 318 (3d Cir. 1946) ("all instructions to the jury be given by the trial judge orally in the presence of counsel and the defendant"); *Purdy v. State*, 267 Ind. 282, 369 N.E.2d 633, 635-36 (1977) (trial court must communicate instructions to the jury in open court); *State v. Norris*, 10 Kan. App. 2d 397, 699 P.2d 585, 588 (1985) ("oral instruction is vital to the fulfillment of the court's duty to instruct the jury"); *State v. Lindsey*, 245 N.J. Super. 466, 586 A.2d 269, 274 (1991) (trial court must recite all instructions to the jury). "At the minimum the *entire* instructions should be read to the jury." *Lindsey*, 586 A.2d at 274 (emphasis in original).

■ The State notes correctly that this court generally presumes the jury follows its instructions. *State v. Foster*, 135 Wn.2d 441, 472, 957 P.2d 712 (1998). But that rule will not cure a trial court's failure to support a written instruction with an oral recitation; a trial court's failure to recite an instruction to the jury is analogous to giving an erroneous, ambiguous, or misleading instruction. *See Ho v. Carey*, 332 F.3d 587, 593-94 (9th Cir. 2003) (holding that written instructions did not cure erroneous oral instruction). Further, we will not presume the jury reads written instructions alone or that the jury was sufficiently literate to comprehend the instructions accurately. *See Norris*, 699 P.2d at 588 (noting "a divergence in literacy and reading comprehension may leave some jurors uninstructed"); *Lindsey*, 586 A.2d at 274 (declining to assume each juror would "independently read" the instructions or that each juror "was sufficiently literate to read and comprehend" them). Accordingly, the standard presumption that the jury follows its instructions breaks down under these facts. *See Ho*, 332 F.3d at 594-95 (reasoning jury may have followed erroneous instruction).

■ We must now determine whether the trial court's failure to read the instruction was a manifest error affecting a constitutional right. RAP 2.5(a)(3); *see McFarland*, 127 Wn.2d at 333. Here, the concerned instruction defined assault and contained the essential element of specific intent. *State v. Eastmond*, 129 Wn.2d 497, 502, 919 P.2d 577 (1996); *State v. Byrd*, 125 Wn.2d 707, 713-14, 887 P.2d 396 (1995). Omitting the instruction orally was an error of constitutional magnitude because it relieved the State of its burden of proving every essential element of the crime beyond a reasonable doubt. *Eastmond*, 129 Wn.2d at 502; *Byrd*, 125 Wn.2d at 713-14; *see also State v. Iosefa*, 77 Haw. 177, 880 P.2d 1224, 1230 (Ct. App. 1994) (holding trial court's failure to recite a presumption of innocence instruction "seriously jeopardized" the defendant's federal constitutional right to due process and a fair trial).

To determine whether the constitutional error is manifest, the appellate court previews the merits of the claim to

see if it has a "likelihood of succeeding." *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999). "Without an affirmative showing of actual prejudice, the asserted error is not 'manifest' and thus is not reviewable under RAP 2.5(a)(3)." *McFarland*, 127 Wn.2d at 334.

Here, the omitted oral instruction contained the essential assault element of specific intent to inflict bodily injury, or to cause apprehension of bodily injury. *See Byrd*, 125 Wn.2d at 712-13. Although the jury had the written instruction, "[i]t is impossible to tell from the record whether the entire jury actually read all of the court's written instructions during its deliberations." *Iosefa*, 880 P.2d at 1231; *see also Marquez*, 963 F.2d at 1315. And as noted, this court "will not indulge any general assumption of literacy of jurors as an excuse for overlooking a defendant's fundamental procedural entitlement." *Lindsey*, 586 A.2d at 275.

Mr. Sanchez's defense to the charge of second degree assault turned on a lack of specific intent. He asserted he was trying to harm himself and no other person. The lack of a specific intent instruction read orally to the jury raises the possibility some jurors might have convicted without a finding of specific intent. *See Byrd*, 125 Wn.2d at 715-16; *see also Ho*, 332 F.3d at 594-95 (reasoning jury may have applied incorrect standard in convicting defendant). Thus, Mr. Sanchez's claim has sufficient merit to warrant review under RAP 2.5(a)(3). *See Eastmond*, 129 Wn.2d at 502-03. And because the failure to read the instruction essentially removed the essential element of specific intent from the jury, it was reversible error. *Byrd*, 125 Wn.2d at 715. The remedy is to reverse the convictions for second degree assault and assault in violation of a protection order and affirm all other counts.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder,

having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Sweeney, A.C.J., and Schultheis, J., concur.