

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39785-8-III |
| Respondent, | ) | |
| | ) | ORDER: (1) GRANTING |
| v. | ) | IN PART MOTION FOR |
| | ) | RECONSIDERATION, AND |
| ZANE C. MCDONALD, | ) | (2) AMENDING OPINION |
| | ) | |
| Appellant. | ) | |

THE COURT has considered the appellant's motion for reconsideration of our July 22, 2025, opinion; and the record and file herein.

IT IS ORDERED that the appellant's motion for reconsideration is granted in part. The first full paragraph on page 8 of the July 22, 2025, opinion is stricken and replaced with the following:

> Chase Eddy, who had no known connection to Anthony Plumb, first came under suspicion after attempting to cash a $500 check drawn on Plumb's bank account and made payable to himself. Bank records further showed transactions made with Eddy's debit card in Spokane and Spokane Valley on April 22.

PANEL: Judges Fearing, Staab, and Murphy

FOR THE COURT:

ROBERT LAWRENCE-BERREY
Chief Judge



**FILED**

Jul 22, 2025

**COURT OF APPEALS**
**DIVISION III**
**STATE OF WASHINGTON**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39785-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ZANE C. MCDONALD, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A jury convicted Zane McDonald with first-degree felony murder with a deadly weapon enhancement, auto theft, and escape. The State posited robbery as the felony on which to base felony first-degree murder. On appeal, McDonald claims insufficient evidence supported a finding that he intended to commit robbery before killing his victim. He seeks reversal of the conviction for use of a deadly weapon because the trial court failed to read the jury instruction outlining the elements for a deadly weapon. He asserts that his defense counsel performed deficiently by failing to renew, at the close of evidence, a motion to sever charges. We affirm all of McDonald's convictions but remand for the striking of a Victim Penalty Assessment (VPA) and a DNA collection fee.

FACTS

This prosecution arises from an alleged murder of Anthony Plumb by Zane McDonald during the early morning hours of April 20, 2021.  We garner the facts from trial testimony.

In early 2021, retiree Anthony Plumb resided in a motorhome on property owned by his friend and former employer, Gerald Zumwalt.  Security conscious Plumb never shared his keys and kept his trailer door locked at all times.  His caution was well-founded.  In a safe, Plumb secreted $15,000 in Social Security disability benefits, intending to purchase a new motorhome and invest in a gold claim with his younger brother, Chester Malito.  Plumb also lived a discreet personal life.  Despite being a bisexual man and grappling with his sexual identity, he was privately attracted to African American men, despite outwardly opposing interracial relationships.  Plumb drank alcohol excessively.  When intoxicated, Plumb grew loud, and others avoided his presence.

In late March 2021, Anthony Plumb encountered Zane McDonald walking from McDonald' mother's home near Gerald Zumwalt's residence.  McDonald, a 27-year-old homeless African American military veteran, struggled to finance a $100-a-day fentanyl and methamphetamine habit.  Before the addiction, McDonald had earned a basketball scholarship at Skagit Valley College and served as a mechanic in the Army.

2

Nevertheless, due to his drug abuse and shady companions, McDonald's mother denied him residence in her dwelling. Plumb offered McDonald refuge inside his motorhome on the condition that he keep his presence discreet.

According to Zane McDonald, on the first day he met Anthony Plumb, Plumb provided him a clean towel and socks. Plumb allowed McDonald to shower, and then Plumb fixed him a bowl of chili. At some point, Plumb grabbed McDonald's penis. McDonald responded, "whoa, whoa, whoa," to which Plumb apologized, saying, "I'm sorry, I couldn't help myself." Rep. of Proc. (RP) at 1259. A dismayed and offended McDonald exited the home. He hoped to create a safety plan to prevent similar incidents with Plumb.

In mid-April 2021, Zane McDonald learned from his parents that "a creepy old guy" came to their house looking for him. RP (Mar. 21, 2023) at 1263-64. McDonald believed the visitor to be Plumb.

On April 19, 2021, Mindee Deligt drove Zane McDonald and Corina Miller throughout Spokane Valley. McDonald had recently met Deligt. Deligt and Miller were friends. During the ride, the trio smoked fentanyl pills. During the travel, Deligt drove to McDonald's mother's home. McDonald asked his mother for money, which request she denied.

3

At some unidentified time in the afternoon, Mindee Deligt, Zane McDonald and Corina Miller arrived at Anthony Plumb's motorhome. McDonald had access to a motorhome key and explained to Deligt how he knew the owner. He added that Plumb had touched him inappropriately after inviting him into his motorhome and had watched him while he showered. Deligt suspected that the relationship involved more than McDonald admitted:

> I mean, just from meeting him to getting a cigarette lighter to touching him and to taking a shower, just the whole relationship just didn't seem right.

RP (Mar. 15, 2023) at 759. McDonald told Deligt that he would blackmail Plumb for money because Plumb did not wish for his family to know of his sexual orientation. McDonald did not utter any threat to steal from or injure Plumb.

According to Zane McDonald, when the trio arrived at Anthony Plumb's motorhome, he entered the home and spoke with Plumb. McDonald asked Plumb why he had visited McDonald's parents' home. McDonald and Plumb agreed that McDonald would return later that evening, after Michael Zumwalt and his girlfriend had left. McDonald testified that he left Plumb's property around 6:00 or 7:00 p.m. on April 19.

During the night of April 19-20, 2021, Gerald Zumwalt hosted a party at his residence. During the gathering and after midnight, Zumwalt's girlfriend, Doris Cowart, fell and struck her head. In response, Zumwalt retrieved Plumb from his motorhome to

4

help administer first aid.  Zumwalt's daughter, Misty Martinson, found Plumb to reek of alcohol.

The April 19 pill-smoking journey of Mindee Deligt, Zane McDonald, and Corina Miller continued into the early morning hours of April 20 when Deligt returned to Anthony Plumb's motorhome and deposited McDonald there at another unidentified time.  When arriving at the motorhome, McDonald expressed frustration that he could not sleep in his mother's hair salon and was forced to stay with Plumb.  Deligt needed to persuade McDonald to exit her vehicle:

> Well, it wasn't like I was kicking him out, but it was like—he was lingering so I was like okay, come on, let's go; you know, we got to go; like all right, get your stuff, let's go.  But, I mean, I didn't try and kick him out, but it was lingering.

RP (Mar. 15, 2023) at 768.  McDonald took with him a weighted blanket and a toothbrush.

At approximately 2:30 a.m., Gerald Zumwalt awoke to the sound of his dogs barking.  Peering outside, he saw nothing unusual.

At trial, Zane McDonald testified to events that occurred after he returned to Anthony Plumb's motorhome during the early morning of April 20.  The State deemed the testimony incredulous, and the jury probably agreed.

According to Zane McDonald's trial testimony, McDonald watched a movie as an intoxicated Plumb walked outside to ensure that Michael Zumwalt and his girlfriend had retired. When Plumb returned inside, McDonald rose from his chair. Plumb simultaneously shoved McDonald back into his seat while pulling down his pants. Plumb proceeded to perform oral sex against McDonald's will. When Plumb ignored his protests, McDonald froze and looked away. Plumb stopped when McDonald did not become erect. A shaken McDonald laid down with a blanket in the back of the motorhome.

Zane McDonald continued with his trial testimony. He averred that, shortly after lying down, he awoke to the blanket being pulled from his body, and he saw Anthony Plumb standing near in his underwear and holding a knife. McDonald believed Plumb intended to forcefully penetrate him. To prevent being raped, McDonald used his military training to redirect the knife toward Plumb. McDonald stabbed Plumb in the chest until McDonald gained space to move through the hallway and toward the front of the motorhome. McDonald attempted to exit through the side door, but it was locked, which confused him. McDonald called his mother, Quincy McDonald, with the phone Plumb had given him. She refused to answer because of the time being 4:00 a.m. McDonald left the motorhome by foot. McDonald did not call the police because of fear

and apprehension of explaining Plumb's overtures to him. He did not know what happened to the knife.

Later that morning, Gerald Zumwalt grew uneasy when Anthony Plumb failed to join him on his back porch for their customary cigarette and coffee. Zumwalt knocked on Plumb's motorhome door but received no response.

On April 23, 2021, Anthony Plumb's younger brother, Chester Malito, and Plumb's mother, Dixie Mullins, learned that others had not seen Plumb since April 21. The mother and brother went to Plumb's motorhome. Malito, on finding the home's door unlocked, entered the home and discovered it ransacked and spattered with blood. Malito discovered Plumb dead under a blanket, with one foot protruding.

Rescue personnel concluded that someone had stabbed Anthony Plumb through the neck. Plumb's death was not instantaneous. The nature of the injury suggested his assailant had stabbed him with a sharp object, then rotated the weapon before stabbing again. Plumb had no defensive wounds. Bloody handprints and blood stains dotted the motorhome. Behind Plumb's lifeless body sat his unlocked safe, emptied of its contents.

Spokane County Sheriff's Office detectives canvassed the neighborhood in an unsuccessful attempt to obtain surveillance footage. The lead investigator, Detective Scott Bonney, interviewed Anthony Plumb's family. Detective Bonney learned that friends last saw Plumb when he assisted Doris Cowart outside the party at Gerald

Zumwalt's home. A subpoena of Plumb's bank records revealed suspicious financial transactions on his account.

On April 21, 2021, Chase Eddy, who lacked a connection to Anthony Plumb, purchased, with Plumb's debit card, items at a smoke shop in Ephrata. Eddy continued using the card for additional transactions in Spokane and Spokane Valley on April 22. On April 23, a $500 check issued to Eddy on Plumb's bank account bounced due to insufficient funds.

Detective Scott Bonney later located Chase Eddy, who rested in jail on unrelated charges. Eddy refused to speak with Bonney about the suspicious transactions. Detective Bonney excluded Eddy as a homicide suspect based on the timing and location of the transactions.

Based on a May 3, 2021, tip, Detective Scott Bonney began investigating Zane McDonald. A police database showed McDonald and Chase Eddy as criminal associates. Eddy perished in a motorcycle accident after being released from jail soon thereafter.

On May 11, 2021, Zane McDonald purloined Chris McFarland's 1998 Jeep Cherokee. The following day, law enforcement found McDonald asleep in the Jeep near McFarland's home. Officers arrested McDonald for auto theft.

On May 12, 2021, Detective Scott Bonney interrogated Zane McDonald, who admitted to knowing Anthony Plumb and possessing a key to his motorhome.

McDonald described their relationship as symbiotic—McDonald received shelter while Plumb received companionship. He claimed Plumb viewed him as "eye candy" and frequently commented about his genitals. RP (Mar. 16, 2023) at 887. When asked if they were sexually involved, McDonald declined to answer but emphasized he was not gay and had only stayed with Plumb out of desperation. McDonald admitted to being with Plumb on the night of April 19-20, the night Doris Cowart fell and struck her head outside Gerald Zumwalt's home. According to McDonald, when Zumwalt arrived to retrieve Plumb, he and Plumb were watching a movie in the motorhome. At Plumb's urging, McDonald left from the opposite side door to avoid being seen.

During the interview, Detective Scott Bonney also questioned Zane McDonald about whether he knew of a large sum of money inside Anthony Plumb's safe. McDonald admitted he knew of the safe, but he insisted he never touched the safe due to Plumb's warnings. McDonald added that Plumb would hurt him if he tried to steal from Plumb.

Detective Scott Bonney seized personal property in Zane McDonald's possession and collected his DNA sample pursuant to a search warrant. Phone records revealed that someone called and texted from Anthony Plumb's phone to Quincy McDonald, Zane's mother, at 4:25 a.m. on April 20, 2021. Quincy confirmed that the calls came from her son, Zane, and added that she had not received calls or texts from Plumb's phone before.

Quincy McDonald later informed investigators that Zane had been robbed of a significant amount of money after April 20. Forensic analysis discovered the presence of Zane McDonald's fingerprint on the handle of the door to Anthony Plumb's safe. Investigators also discovered McDonald's sperm in Plumb's mouth. Other analysis detected McDonald's DNA on a key to the safe found in the cupholder of the Jeep wherein McDonald had been arrested.

Detective Branson Schmidt arrested Zane McDonald on June 30, 2021, for the murder. Upon arriving at the Public Safety Building, McDonald fled while being escorted from Detective Schmidt's patrol car. With his hands cuffed behind his back, McDonald ran fifty yards before he tripped and was recaptured by officers.

PROCEDURE

The State of Washington charged Zane McDonald with first-degree felony murder predicated on second-degree robbery (Count I), second-degree felony murder predicated on second-degree assault (Count II), second-degree taking a motor vehicle without permission (Count III), and second-degree escape (Count IV). Both murder charges carried a deadly weapon enhancement.

Before trial, Zane McDonald moved to sever the charges of taking a motor vehicle without permission and escape from the murder charges. The trial court denied the motion. The court reasoned that the evidence for all charges would be cross-admissible,

10

the defenses would remain distinct, and a joint trial would not be unduly prejudicial when compared with judicial economy.

During pretrial motions, the defense notified the State that Zane McDonald intended to identify Chase Eddy as an alternative suspect in the theft of property from Anthony Plumb. The defense asked for an order in limine, under ER 404(b) and 609, that law enforcement officers be prohibited from testifying they recognized McDonald from earlier contacts. The State's attorney responded:

> Your Honor, I do not believe that will be an issue. If I believe it is an issue, I will address the Court outside the presence of the jury to see if I can use that phrase because I think would be appropriate.

RP (Mar. 9, 2023) at 120.

During pretrial motions, the superior court prohibited both parties from eliciting inflammatory statements from witnesses that expressed a negative attitude toward same-sex or mixed-race relationships. The court also barred the use of the words "racist," "homophobic," or "homophobe."

During trial cross-examination of Detective Scott Bonney, defense counsel elicited testimony regarding the detective's efforts to meet with Chase Eddy:

> [DEFENSE COUNSEL]: So, Mr. Plumb was lying deceased in the motorhome for, give or take, a couple days, maybe three days?
> [DETECIVE BONNEY]: Yes.
> [DEFENSE COUNSEL]: And check number 345 was written after his death?

11

[DETECTIVE BONNEY]: Yes.

[DEFENSE COUNSEL]: The check was obviously not written by Mr. Plumb?

[DETECTIVE BONNEY]: I couldn't tell you that for sure, but based on the–the dates on here, other investigative means with no connection between those two individuals, that is my conclusion.

. . . .

[DEFENSE COUNSEL]: So, after receiving all these records, you attempted to speak to Mr. Chase Eddy at the jail?

[DETECIVE BONNEY]: I did.

[DEFENSE COUNSEL]: Okay. You had Mr. Chase Eddy brought to you?

[DETECTIVE BONNEY]: Yes. To interview inmates, typically what we do is call over to the jail, and there's a special area in the jail that we can access. It's a small interview room they bring inmates out to. We got to request it to go meet with them.

[DEFENSE COUNSEL]: So, Mr. Eddy pretty immediately interrupted you when you tried to interview him?

. . . .

[DETECTIVE BONNEY]: I was interrupted.

[DEFENSE COUNSEL]: He refused to speak to you?

[DETECIVE BONNEY]: Yes.

[DEFENSE COUNSEL]: Or any members of the sheriff's office? If you'd like to refer to your report.

. . . .

[DETECIVE BONNEY]: Yes, he refused to speak to me or anyone else from the sheriff's office.

[DEFENSE COUNSEL]: Thank you. In fact, he stood up?

[DETECTIVE BONNEY]: If I could read the whole thing off the report. He refused to speak with me or anybody from the sheriff's office, as he was pointing to my badge. Actually, I think I was wearing a belt badge. He then turned his back on me, stood by the exit door waiting for the jail escort, because it's a—it's kind of like a halfway room. Part of it connects to an area that accesses the sheriff's office and part of it connects to an area that accesses the jail. So, this room we meet in has doorways leading into both. Kind like a — like an olly olly oxen free zone. He turned toward that door and just waited to be brought back, clearly

designated he didn't want to talk to me or anybody else from the sheriff's office.

RP (Mar. 15, 2023) 748-51. On redirect, the State asked Detective Bonney:

[STATE]: Detective, what does the term criminal association mean?

[DETECTIVE BONNEY]: That's a term widely used for people who—criminals who associate with each other for criminal purposes or criminal endeavors.

[STATE]: In the Spokane Sheriff's Department, do you maintain records so you can determine if there are criminal associations between different individuals?

[DEFENSE COUNSEL]: Objection. Relevance.

[STATE]: The door has been opened on this, Your Honor, as far as the investigation into Chase Eddy.

THE COURT: Overruled.

[DETECTIVE BONNEY]: We maintain all police records. Every report we write, every time somebody calls 9-1-1 or Crime Check, a document is generated from that. That goes into a database when that physical document, so like a printed paper could be viewed or digital copy of that. But as well what we call pedigree information, names, birthdays, phone numbers, addresses, all that information goes into a searchable database. So, if I need to look somebody up, I can run their name and I can see every contact they had with police, where that occurred, the date and time of it, if there was a phone number associated with it, and who other people were associated.

So, if I were contacted by the police and five of my friends with me, you could see their names associated with it, you could see the address we were contacted at and such.

[STATE]: Did you have criminal associations between Mr. Chase Eddy and Mr. McDonald?

[DETECTIVE BONNEY]: I did.

[STATE]: Did you find any criminal association between the two?

[DETECTIVE BONNEY: I found some loose associations between Mr. McDonald and Mr. Eddy.

[DEFENSE COUNSEL]: Objection, Your Honor. Hearsay.

THE COURT: Overruled.

13

> [DETECTIVE BONNEY]: Based on a location they had both frequented in Spokane Valley around the same time of this incident. I don't know the exact date though.

RP (Mar. 15, 2023) at 751-53. Detective Bonney further testified on redirect that he eliminated Chase Eddy as a suspect.

Zane McDonald moved for dismissal or a mistrial. McDonald argued that the State knew he intended to present Chase Eddy as an alternative suspect and that its failure to disclose Detective Scott Bonney's knowledge of a loose criminal association between Eddy and McDonald constituted a discovery violation. Additionally, McDonald asserted that this evidence fell under ER 404(b) particularly given that Eddy had deposited a forged check from the victim's account and had a documented criminal association with McDonald.

In response, the State argued that it had provided Detective Scott Bonney's report detailing his investigation into Chase Eddy. The State contended that any connections between Eddy and Zane McDonald lacked relevance until McDonald suggested that Eddy killed Anthony Plumb. McDonald had earlier only implicated Eddy in the theft. At that point, the State sought to demonstrate that McDonald could have given the forged check to Eddy. Additionally, the State noted that Detective Bonney had authored multiple reports, the defense had the opportunity to interview him but did not request to do so, and the undisclosed information was not exculpatory.

14

The trial court denied Zane McDonald's combined motion because Detective Scott Bonney's written report held "very little information" regarding a loose connection between Chase Eddy and McDonald. Clerk's Papers (CP) at 804. Thus, the State had no material documents to disclose. Additionally, the court found that the unwritten information was not exculpatory and only introduced by the State in response to the defense's alternative suspect theory. The court reasoned that, if the defense intended to raise an alternative suspect theory, defense counsel would best gain information about the connection between Eddy and McDonald by interviewing Detective Bonney. The court would not have expected Bonney to write a report about criminal associations.

Zane McDonald later moved to strike the testimony regarding Zane McDonald's and Chase Eddy's alleged criminal association, and McDonald requested a curative instruction for the jury. The trial court denied both requests.

During trial testimony, Zane McDonald conceded that he was robbed of "thousands of dollars" worth of drugs after Anthony Plumb's death. RP (Mar. 22, 2023) at 1310. He denied stealing Plumb's money or checkbooks from the safe and claimed no knowledge of any money possessed by Plumb. When questioned about his May 12 interview with Detective Scott Bonney, McDonald explained that he was confused, afraid, and high at the time. He concealed Plumb's conduct because of discomfort about speaking about sex with another man. When asked to explain the presence of the key to

15

the safe found in the Jeep, McDonald answered that Plumb gave him a phone and a ring

of keys so he could enter the motorhome as he pleased. In explaining his flight from

officers following his arrest, McDonald claimed he was "extremely high" and attempting

suicide-by-cop. RP (Mar. 22, 2023) at 1309.

The trial court instructed the jury on felony first-degree murder:

> A person commits the crime of murder in the first-degree when he or she commits or attempts to commit second-degree robbery and in the course of or in furtherance of such crime or in immediate flight from such crime he or she causes the death of a person other than one of the participants unless the killing is justifiable.
>
> To convict the defendant of the crime of murder in the first-degree, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (l) That on or about the 20th day of April 2021, the defendant committed or attempted to commit second-degree robbery;
>
> (2) That the defendant caused the death of Anthony Plumb in the course of or in furtherance of such crime or in immediate flight from such crime;
>
> (3) That Anthony Plumb was not a participant in the crime of second-degree robbery; and
>
> 4) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty. RP (Mar. 23, 2023) at 1456-57.

The trial court also instructed on the elements required to establish second-degree

robbery:

16

A person commits the crime of robbery in the second-degree when he or she unlawfully and with intent to commit theft thereof takes personal property from the person or in the presence of another and the taking was against that person's will by the use or threatened use of immediate force, violence, or fear of injury to that person. The force or fear must be used to obtain or retain possession of the property or to prevent or overcome resistance to the taking, in either of which case the degree of force is immaterial. The taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom it was taken, such knowledge was prevented by the use of force or fear. The taking constitutes robbery even if death precedes the taking, if the person intended to take the property prior to death.

RP (Mar. 22, 2023) at 1457-58.

When reading the jury instructions to the jury, the court failed to read

Instruction No. 40, which pertained to the deadly weapon special verdict forms.

That instruction stated:

For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crimes in Count I and Count II.

A deadly weapon is an implement or instrument that has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instruments are examples of deadly weapons: blackjack, sling shot, billy, sand club, sandbag, metal knuckles, any dirk, dagger, pistol, revolver or any other firearm, any knife having a blade longer than three inches, any razor with an unguarded blade, and any metal pipe or bar used or intended to be used as a club, any explosive, and any weapon containing poisonous or injurious gas.

CP at 391.

17

Defense counsel did not object to the trial court's omission in reading Instruction No. 40. During closing arguments, the State referenced the deadly weapon instruction and displayed a PowerPoint slide reciting Instruction No. 40.

During deliberations, the jury asked the trial court: "Does intent to blackmail include intent to rob?" RP (Mar. 24, 2023) at 1538. Both parties agreed that the court should direct the jury to refer to its instructions, and the court did so.

The jury found Zane McDonald guilty as charged, including convictions for both first-degree felony murder and second-degree felony murder. McDonald moved for a new trial under CrR 7.5(b) on multiple grounds, including a renewed claim that the State violated discovery rules by failing to disclose a police database entry indicating a criminal connection between McDonald and Chase Eddy. The trial court denied the motion. The trial court dismissed the second-degree murder conviction on double jeopardy grounds because of the first-degree murder conviction.

The trial court sentenced Zane McDonald to a total of 302 months of confinement for first-degree felony murder (Count I), taking a motor vehicle without permission (Count III), and escape (Count IV). The judgment omitted any reference to the second-degree felony murder guilty verdict. The court also imposed a $500 victim penalty assessment and a $100 DNA collection fee.

LAW AND ANALYSIS

On appeal, Zane McDonald contends insufficient evidence supported his conviction for felony murder in the first-degree. He also renews his argument that the State violated its discovery obligation when failing to produce the law enforcement database that connected McDonald and Chase Eddy as criminal associates. On appeal, McDonald further contends that his trial counsel performed ineffectively when failing to renew the motion to sever charges at the end of the case and that the trial court erred when failing to read aloud a deadly weapon instruction. Finally, in the event we affirm his convictions, he asks that we strike his VPA and DNA collection fee. In a statement of additional grounds, McDonald argues that racism infected the trial court's evidentiary rulings.

Sufficiency of Evidence

Zane McDonald argues that, for two reasons, the State presented insufficient evidence to convict him of first-degree felony murder based on the underlying felony being robbery. First, the State presented no evidence that someone took Anthony Plumb's property before his death. Second, the State presented no evidence that Plumb's demise was a foreseeable consequence of a robbery.

When evaluating whether sufficient evidence supports a conviction, an appellate court must view the evidence in the light most favorable to the prosecution and determine

19

whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of insufficient evidence accepts the truth of the State's evidence, along with all reasonable inferences drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Direct evidence is not required to uphold a jury's verdict; circumstantial evidence suffices. *State v. O'Neal*, 159 Wn.2d 500, 506, 150 P.3d 1121 (2007).

We disagree with Zane McDonald's contention that the State needed to prove the taking of property before the killing of Anthony Plumb. The State only needed to prove that McDonald formed the intent to take property before the death. To convict McDonald of first-degree felony murder, the State needed to prove that he committed or attempted to commit second-degree robbery and that, "in the course of or in furtherance of such crime or in immediate flight therefrom," he caused Plumb's death. RCW 9A.32.030; CP at 358. The felony murder statute seeks to penalize accidental, negligent, or reckless killings that occur in the course of a distinct felony. *In re Personal Restraint of Bowman*, 162 Wn.2d 325, 333, 172 P.3d 681 (2007). In a felony murder prosecution, chronology of events becomes key. *State v. Irby*, 187 Wn. App. 183, 201, 347 P.3d 1103 (2015). The State must present evidence that the death was a probable consequence of the felony and must specifically prove that the felony began before the killing. *State v. Hacheney*, 160 Wn.2d 503, 518, 158 P.3d 1152 (2007).

In support of this assertion of insufficient evidence, Zane McDonald primarily

relies on *State v. Irby*, 187 Wn. App. 183 (2015). In *State v. Irby*, the victim was

discovered days after being beaten to death. A law enforcement officer found the body

inside a shop separate from the victim's residence. The door to the victim's upstairs

bedroom inside the home had been forced open, several weapons were missing, and

neighbors had seen Terrance Irby in the area several days before the discovery of the

victim's body. Law enforcement recovered the victim's weapons and blood from Irby's

truck at the time of his arrest. The court held the State did not meet its burden of proving

that the burglary occurred before the killing because it was equally plausible that Irby

killed the victim in the shop first and then went upstairs to break into the bedroom and

steal the guns.

*State v. Irby* establishes that the chronology of events underlying the State's theory

that a killing occurred during or in furtherance of a crime must be supported by evidence

that convincingly contradicts the defendant's sequence of events. Nevertheless,

convicting Zane McDonald did not require speculation to place intent to rob before the

killing of Anthony Plumb.

The State presented strong evidence of Zane McDonald's desire to rob Anthony

Plumb of his thousands of dollars before McDonald retired to the motorhome on the night

of April 19-20. McDonald needed money to feed his addiction, which cost him $100 per

day. McDonald had no income. On April 19, McDonald had asked his mother for money. McDonald knew that Plumb stashed money in his safe. McDonald had told Mindee Deligt he might threaten to tell others of Plumb's sexual orientation in order to garner money from Plumb. Plumb had announced intentions to move to Arizona such that McDonald needed to act quickly to secure the money. McDonald's comments to Detective Scott Bonney suggest that violence would result from McDonald attempting to seize money from Plumb. One wonders how McDonald knew that violence would erupt unless he had tried to take money before. If McDonald had acted in self-defense, he likely would have disclosed this scenario to others earlier. McDonald's delayed revelation that he killed Plumb to prevent being raped tested his credibility.

Zane McDonald emphasizes the jury question about whether an intent to blackmail can carry over to an intent to rob. We decline to guess at the significance of the juror question. The jury determination lies in the verdict not in jury questions. *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988).

Discovery Violation

Zane McDonald argues that the State denied him a fair trial because it failed to disclose in discovery, as required under CrR 4.7(a)(1)(i), a police database that identified a criminal association between Chase Eddy and him. McDonald emphasizes the State knew in advance that the defense named Eddy as an alternative suspect. McDonald

further contends the State engaged in conduct warranting dismissal, under CrR 8.3(b),

because the State elicited testimony regarding his prior police contacts in violation of ER

404(b) and to his prejudice. In the alternative, McDonald seeks a new trial.

Under CrR 4.7(a)(1)(i), the State must disclose to the defendant the witnesses it

intends to call at trial "together with any written or recorded statements and the substance

of any oral statements of such witnesses." Another section of the same rule imposes

another obligation:

> (3) Except as is otherwise provided as to protective orders, the prosecuting attorney shall disclose to defendant's counsel any material or information within the prosecuting attorney's knowledge which tends to negate defendant's guilt as to the offense charged.

CrR 4.7(a). These obligations continue throughout the prosecution. CrR 4.7(h)(2).

Zane McDonald's complaint about the failure in discovery does not implicate a

written or oral statement of a witness. The information about a loose criminal association

inculpated, not exculpated, McDonald. McDonald argues that, despite the language of

CrR 4.7(a)(3) mentioning only the negation of guilt, the State has a duty to disclose any

inculpatory evidence known to it. McDonald cites *State v. Oughton*, 26 Wn. App. 74, 79,

612 P.2d 812 (1980) for this proposition. *Oughton* stands for such a rule but only in the

context of CrR 4.7(a)(1), not 4.7(a)(3). Under the latter rule subsection, the State need

only produce exculpatory evidence. *State v. Mullen*, 171 Wn.2d 881, 895, 259 P.3d 158 (2011).

A trial court exercises discretion when deciding how to handle an alleged discovery violation. *State v. Barry*, 184 Wn. App. 790, 796, 339 P.3d 200 (2014). Discovery violation sanctions are reviewed for an abuse of discretion. *State v. Barry*, 184 Wn. App. 790, 797 (2014). The superior court did not abuse its discretion when denying sanctions against the State because of any failure to disclose the police database.

Zane McDonald also asserts that testimony about the police database showing a loose criminal connection with Chase Eddy either violated an order in limine or the State's promise that no officer would testify to earlier contact with McDonald. McDonald's motion in limine specifically sought to preclude an officer from testifying to earlier contact with McDonald. Information from the database implies some earlier contact between McDonald and law enforcement. Nevertheless, Detective Scott Bonney did not himself testify to any earlier contact. Although the evidence skirted any promise to avoid evidence of earlier police contact, we conclude the evidence did not violate any order or promise. Also, the State introduced the evidence only after McDonald suggested that Eddy pilfered Anthony Plumb's money.

Reading of Jury Instruction

Zane McDonald argues that his conviction for being armed with a deadly weapon while committing felony first-degree murder must be vacated because the trial court failed to read Instruction No. 40 aloud. CrR 6.15 governs the procedures for instructing a jury on matters of law. Subsection (d) explicitly states, "The court shall read the instructions to the jury." The word "shall" conveys a mandatory intent. *State v. Sanchez*, 122 Wn. App. 579, 589, 94 P.3d 384 (2004). The trial court has a mandatory duty to read the written instructions to the jury. *State v. Sanchez*, 122 Wn.App. 579, 589 (2004). Thus, the trial court erred when omitting the reading of Jury Instruction No 40.

Because Zane McDonald did not object to the superior court's failure to read the instruction at trial, McDonald asserts the mistake constitutes manifest constitutional error. Generally, this court does not review issues raised for the first time on appeal unless (1) the error is manifest and (2) of constitutional magnitude. RAP 2.5(a); *State v. Kirkman*, 159 Wn.2d 918, 934, 155 P.3d 125 (2007). Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988). Second, perhaps perverting the term "manifest," some decisions emphasize prejudice, not obviousness. The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the

25

defendant's rights.  This showing of actual prejudice makes the error "manifest,"

allowing appellate review.  *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009);

*State v. Scott*, 110 Wn.2d 682, 688 (1988).  A third formulation for manifest

constitutional error asks whether the facts necessary to adjudicate the claimed error lie in

the record on appeal.  *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995);

*State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

Because panel members differ in what formulation of manifest constitutional error

to follow in this appeal, we choose not to address whether the assigned error qualifies as

manifest constitutional error.  Instead, we affirm the deadly weapon conviction on the

basis of harmless error.  If a court determines the claim raises a manifest constitutional

error, the appeal may still be subject to a harmless error analysis.  *State v. Kirkman*, 159

Wn.2d 918, 935, 155 P.3d 125 (2007); *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756

(2009).

Jury Instruction No. 40 concerned the definition of a deadly weapon.  The

undisputed evidence established that Zane McDonald employed a deadly weapon, a

knife, to kill Anthony Plumb.  McDonald contended he killed Plumb in self-defense, but

he conceded employing a knife.  The failure to read the jury instruction did not prejudice

McDonald.

26

Zane McDonald relies on *State v. Sanchez*, 122 Wn. App. 579, 590 (2004), wherein we held that a trial court's failure to read an instruction defining an essential element of the crime constituted manifest constitutional error. The trial court failed to read the jury instruction on specific intent. The jury convicted John Sanchez with the crime of assault, which included the element of an intent to inflict bodily injury or to cause apprehension of bodily injury. At trial, Sanchez presented testimony negating an intent to harm or cause fear. After concluding Sanchez showed manifest constitutional error, we reversed the conviction. We did not conduct any harmless error analysis.

This court, in *State v. Sanchez*, may have disregarded Supreme Court precedent by failing to conduct a harmless error analysis. Or this court may have conflated manifest constitutional error with harmful error and automatically concluded that John Sanchez showed prejudice because of the evidence he presented that negated specific intent. Regardless, we conclude we must still perform a harmless error analysis, which establishes no harm to Zane McDonald by reason of the failure to read Jury Instruction No. 40.

## Severance of Charges

Zane McDonald contends that defense counsel performed ineffectively when failing to renew the motion to sever charges. Trial counsel had requested severance before trial, but did not renew the motion at the end of trial. Under CrR 4.4(a)(2), the

27

accused waives the right to appeal the denial of a pretrial motion to sever, if he fails to renew the motion at the close of evidence.

To establish ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was deficient and (2) the deficiency resulted in prejudice. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Performance is deficient if it falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Prejudice is shown by establishing a "reasonable probability" that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2d 674, 80 L. Ed. 3d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 337 (1995). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

Zane McDonald argues that combining the escape charge with his murder charge was more prejudicial than probative, as the former charge suggested a general criminal disposition rather than serving as evidence of consciousness of guilt for the homicide. He contends that this prejudice was heightened because he did not contest the auto theft and escape charges.

Regardless of whether counsel performed deficiently, Zane McDonald fails to establish that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Given the weakness of McDonald's version of events, the admission of this evidence did not deprive him of a fair trial. Even assuming counsel's performance was deficient, the errors were not "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The trial court performed a thorough analysis when denying severance before trial, which analysis would also have led to denial of the motion to sever after the ending of evidence.

## VPA and DNA Collection Fee

Zane McDonald argues that the victim penalty assessment and DNA collection fee should be struck from his judgment and sentence based on recent amendments to legal financial obligations. The State agrees. A recent statutory amendment prohibits sentencing courts from imposing the assessment if the defendant is indigent at the time of sentencing. LAWS OF 2023, CH. 449, § 1. Additionally, the legislature eliminated the mandatory DNA collection fee under former RCW 43.43.754 (2021). LAWS OF 2023, CH. 449, § 4(2). Although these amendments were enacted after McDonald's sentencing,

they apply to cases pending on appeal. *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

## Statement of Additional Grounds

In his statement of additional grounds, Zane McDonald argues that the trial court erred by prohibiting either party from eliciting from a witness inflammatory statements made by a witness expressing a negative attitude toward same-sex or mixed-race relationships or a witness labeling any witness as "homophobic" or "racist" or using the terms "racist" or "homophobe" during opening or closing statements. He contends that this restriction improperly excluded relevant testimony, as its probative value outweighed any prejudicial effect.

A trial court's ruling under ER 403 is subject to reversal only if it constitutes an abuse of discretion. *State v. Barry*, 184 Wn. App. 790, 339 P.3d 200 (2014). An abuse of discretion occurs when a decision is based on untenable grounds, made for untenable reasons, or is manifestly unreasonable. *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). Zane McDonald asserts that racial bias influenced the trial court's ruling.

In granting the motion in limine, the trial court stated:

> The motion, here, is really fairly simple. It's a motion to exclude labeling witnesses as homophobic or racist. If the attorneys start labeling them, I think those labels are used to strike an emotional response from the jury, rather than having the jury decide whether or not the witnesses might be bias based upon some racist tendencies or homophobic tendencies. That

30

can be done without using those particular terms.  So, if, for instance, one witness does have some racist views, those are welcome to be presented to the jury without using those terms because, ultimately, that is a conclusion whether a person is racist or homophobic and whether or not that would bias their testimony.  The jury's ultimately the ones to make that determination.  That's a credibility issue.  So, the Court will grant this motion.  Nothing in this motion prevents the attorneys from inquiring into the witness' views to show that they might have some type of bias, but the labeling of the witnesses is something that the jury can do after they decide about the credibility.  So that motion will be granted.

RP (Mar. 29, 2023) at 29.

Trial courts have broad discretion to determine the relevance of evidence and to weigh its probative value against any potential prejudicial effect.  *State v. Barry*, 184 Wn. App. 790, 339 P.3d 200 (2014).  In this case, the court appropriately exercised its discretion under ER 403 to determine whether the risk of unfair prejudice substantially outweighed the evidence's probative value.

No. 39785-8-III
*State v. McDonald*

CONCLUSION

We affirm Zane McDonald's convictions, including his conviction for employing a deadly weapon. We remand to the trial court to strike the victim penalty assessment and the DNA collection fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Murphy, J.

_____
Staab, A.C.J.